# UNITED STATES *v.* O'HAGAN

No. 96–842.   Argued April 16, 1997—Decided June 25, 1997

644

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, SOUTER, and BREYER, JJ., joined, and in which SCALIA, J., joined as to Parts I, III, and IV. SCALIA, J., filed an opinion concurring in part and dissenting in part, *post*, p. 679. THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which REHNQUIST, C. J., joined, *post*, p. 680.

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Dellinger, Acting Assistant Attorney General Richard, Paul R. Q. Wolfson, Joseph C. Wyderko, Richard H. Walker, Paul Gonson, Jacob H. Stillman, Eric Summergrad,* and *Randall W. Quinn.*

*John D. French* argued the cause for respondent. With him on the brief was *Elizabeth L. Taylor.**

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the interpretation and enforcement of § 10(b) and § 14(e) of the Securities Exchange Act of 1934, and rules made by the Securities and Exchange Commission pursuant to these provisions, Rule 10b–5 and Rule 14e–3(a).

---

*Briefs of *amici curiae* urging reversal were filed for the American Institute of Certified Public Accountants by *Louis A. Craco, Richard I. Miller,* and *David P. Murray;* for the Association for Investment Management and Research by *Stuart H. Singer;* and for the North American Securities Administrators Association, Inc., et al. by *Karen M. O'Brien, Meyer Eisenberg, Louis Loss,* and *Donald C. Langevoort.*

Briefs of *amici curiae* urging affirmance were filed for Law Professors and Counsel by *Richard W. Painter* and *Douglas W. Dunham;* and for the National Association of Criminal Defense Lawyers by *Arthur F. Mathews, David M. Becker, Andrew B. Weissman, Robert F. Hoyt, Lisa Kemler, Milton V. Freeman,* and *Elkan Abramowitz.*

Two prime questions are presented. The first relates to the misappropriation of material, nonpublic information for securities trading; the second concerns fraudulent practices in the tender offer setting. In particular, we address and resolve these issues: (1) Is a person who trades in securities for personal profit, using confidential information misappropriated in breach of a fiduciary duty to the source of the information, guilty of violating § 10(b) and Rule 10b–5? (2) Did the Commission exceed its rulemaking authority by adopting Rule 14e–3(a), which proscribes trading on undisclosed information in the tender offer setting, even in the absence of a duty to disclose? Our answer to the first question is yes, and to the second question, viewed in the context of this case, no.

I

Respondent James Herman O'Hagan was a partner in the law firm of Dorsey & Whitney in Minneapolis, Minnesota. In July 1988, Grand Metropolitan PLC (Grand Met), a company based in London, England, retained Dorsey & Whitney as local counsel to represent Grand Met regarding a potential tender offer for the common stock of the Pillsbury Company, headquartered in Minneapolis. Both Grand Met and Dorsey & Whitney took precautions to protect the confidentiality of Grand Met's tender offer plans. O'Hagan did no work on the Grand Met representation. Dorsey & Whitney withdrew from representing Grand Met on September 9, 1988. Less than a month later, on October 4, 1988, Grand Met publicly announced its tender offer for Pillsbury stock.

On August 18, 1988, while Dorsey & Whitney was still representing Grand Met, O'Hagan began purchasing call options for Pillsbury stock. Each option gave him the right to purchase 100 shares of Pillsbury stock by a specified date in September 1988. Later in August and in September, O'Hagan made additional purchases of Pillsbury call options. By the end of September, he owned 2,500 unexpired Pillsbury options, apparently more than any other individual in-

vestor.  See App. 85, 148.  O'Hagan also purchased, in September 1988, some 5,000 shares of Pillsbury common stock, at a price just under $39 per share.  When Grand Met announced its tender offer in October, the price of Pillsbury stock rose to nearly $60 per share.  O'Hagan then sold his Pillsbury call options and common stock, making a profit of more than $4.3 million.

The Securities and Exchange Commission (SEC or Commission) initiated an investigation into O'Hagan's transactions, culminating in a 57-count indictment.  The indictment alleged that O'Hagan defrauded his law firm and its client, Grand Met, by using for his own trading purposes material, nonpublic information regarding Grand Met's planned tender offer.  *Id.*, at 8.[1]  According to the indictment, O'Hagan used the profits he gained through this trading to conceal his previous embezzlement and conversion of unrelated client trust funds.  *Id.*, at 10.[2]  O'Hagan was charged with 20 counts of mail fraud, in violation of 18 U. S. C. § 1341; 17 counts of securities fraud, in violation of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 48 Stat. 891, 15 U. S. C. § 78j(b), and SEC Rule 10b–5, 17 CFR § 240.10b–5

---

[1] As evidence that O'Hagan traded on the basis of nonpublic information misappropriated from his law firm, the Government relied on a conversation between O'Hagan and the Dorsey & Whitney partner heading the firm's Grand Met representation.  That conversation allegedly took place shortly before August 26, 1988.  See Brief for United States 4.  O'Hagan urges that the Government's evidence does not show he traded on the basis of nonpublic information.  O'Hagan points to news reports on August 18 and 22, 1988, that Grand Met was interested in acquiring Pillsbury, and to an earlier, August 12, 1988, news report that Grand Met had put up its hotel chain for auction to raise funds for an acquisition.  See Brief for Respondent 4 (citing App. 73–74, 78–80).  O'Hagan's challenge to the sufficiency of the evidence remains open for consideration on remand.

[2] O'Hagan was convicted of theft in state court, sentenced to 30 months' imprisonment, and fined.  See *State* v. *O'Hagan*, 474 N. W. 2d 613, 615, 623 (Minn. App. 1991).  The Supreme Court of Minnesota disbarred O'Hagan from the practice of law.  See *In re O'Hagan*, 450 N. W. 2d 571 (1990).

(1996); 17 counts of fraudulent trading in connection with a tender offer, in violation of § 14(e) of the Exchange Act, 15 U. S. C. § 78n(e), and SEC Rule 14e–3(a), 17 CFR § 240.14e–3(a) (1996); and 3 counts of violating federal money laundering statutes, 18 U. S. C. §§ 1956(a)(1)(B)(i), 1957. See App. 13–24. A jury convicted O'Hagan on all 57 counts, and he was sentenced to a 41-month term of imprisonment.

A divided panel of the Court of Appeals for the Eighth Circuit reversed all of O'Hagan's convictions. 92 F. 3d 612 (1996). Liability under § 10(b) and Rule 10b–5, the Eighth Circuit held, may not be grounded on the "misappropriation theory" of securities fraud on which the prosecution relied. *Id.*, at 622. The Court of Appeals also held that Rule 14e–3(a)—which prohibits trading while in possession of material, nonpublic information relating to a tender offer—exceeds the SEC's § 14(e) rulemaking authority because the Rule contains no breach of fiduciary duty requirement. *Id.*, at 627. The Eighth Circuit further concluded that O'Hagan's mail fraud and money laundering convictions rested on violations of the securities laws, and therefore could not stand once the securities fraud convictions were reversed. *Id.*, at 627–628. Judge Fagg, dissenting, stated that he would recognize and enforce the misappropriation theory, and would hold that the SEC did not exceed its rulemaking authority when it adopted Rule 14e–3(a) without requiring proof of a breach of fiduciary duty. *Id.*, at 628.

Decisions of the Courts of Appeals are in conflict on the propriety of the misappropriation theory under § 10(b) and Rule 10b–5, see *infra* this page and 650, and n. 3, and on the legitimacy of Rule 14e–3(a) under § 14(e), see *infra*, at 669–670. We granted certiorari, 519 U. S. 1087 (1997), and now reverse the Eighth Circuit's judgment.

## II

We address first the Court of Appeals' reversal of O'Hagan's convictions under § 10(b) and Rule 10b–5. Following

the Fourth Circuit's lead, see *United States* v. *Bryan*, 58 F. 3d 933, 943–959 (1995), the Eighth Circuit rejected the misappropriation theory as a basis for § 10(b) liability. We hold, in accord with several other Courts of Appeals,[3] that criminal liability under § 10(b) may be predicated on the misappropriation theory.[4]

## A

In pertinent part, § 10(b) of the Exchange Act provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.        .        .        .        .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U. S. C. § 78j(b).

---

[3] See, *e. g., United States* v. *Chestman*, 947 F. 2d 551, 566 (CA2 1991) (en banc), cert. denied, 503 U. S. 1004 (1992); *SEC* v. *Cherif*, 933 F. 2d 403, 410 (CA7 1991), cert. denied, 502 U. S. 1071 (1992); *SEC* v. *Clark*, 915 F. 2d 439, 453 (CA9 1990).

[4] Twice before we have been presented with the question whether criminal liability for violation of § 10(b) may be based on a misappropriation theory. In *Chiarella* v. *United States*, 445 U. S. 222, 235–237 (1980), the jury had received no misappropriation theory instructions, so we declined to address the question. See *infra*, at 661. In *Carpenter* v. *United States*, 484 U. S. 19, 24 (1987), the Court divided evenly on whether, under the circumstances of that case, convictions resting on the misappropriation theory should be affirmed. See Aldave, The Misappropriation Theory: *Carpenter* and Its Aftermath, 49 Ohio St. L. J. 373, 375 (1988) (observing that *"Carpenter* was, by any reckoning, an unusual case," for the information there misappropriated belonged not to a company preparing to engage in securities transactions, *e. g.*, a bidder in a corporate acquisition, but to the Wall Street Journal).

The statute thus proscribes (1) using any deceptive device (2) in connection with the purchase or sale of securities, in contravention of rules prescribed by the Commission. The provision, as written, does not confine its coverage to deception of a purchaser or seller of securities, see *United States* v. *Newman*, 664 F. 2d 12, 17 (CA2 1981); rather, the statute reaches any deceptive device used "in connection with the purchase or sale of any security."

Pursuant to its § 10(b) rulemaking authority, the Commission has adopted Rule 10b–5, which, as relevant here, provides:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> "(a) To employ any device, scheme, or artifice to defraud, [or]
>
> .       .       .       .       .
>
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security." 17 CFR § 240.10b–5 (1996).

Liability under Rule 10b–5, our precedent indicates, does not extend beyond conduct encompassed by § 10(b)'s prohibition. See *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 214 (1976) (scope of Rule 10b–5 cannot exceed power Congress granted Commission under § 10(b)); see also *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 173 (1994) ("We have refused to allow [private] 10b–5 challenges to conduct not prohibited by the text of the statute.").

Under the "traditional" or "classical theory" of insider trading liability, § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation

on the basis of material, nonpublic information. Trading on such information qualifies as a "deceptive device" under § 10(b), we have affirmed, because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Chiarella* v. *United States*, 445 U. S. 222, 228 (1980). That relationship, we recognized, "gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders.'" *Id.*, at 228–229 (citation omitted). The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation. See *Dirks* v. *SEC*, 463 U. S. 646, 655, n. 14 (1983).

The "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, and thereby violates § 10(b) and Rule 10b–5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. See Brief for United States 14. Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.

The two theories are complementary, each addressing efforts to capitalize on nonpublic information through the purchase or sale of securities. The classical theory targets a corporate insider's breach of duty to shareholders with whom the insider transacts; the misappropriation theory outlaws

trading on the basis of nonpublic information by a corporate "outsider" in breach of a duty owed not to a trading party, but to the source of the information. The misappropriation theory is thus designed to "protec[t] the integrity of the securities markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *Ibid.*

In this case, the indictment alleged that O'Hagan, in breach of a duty of trust and confidence he owed to his law firm, Dorsey & Whitney, and to its client, Grand Met, traded on the basis of nonpublic information regarding Grand Met's planned tender offer for Pillsbury common stock. App. 16. This conduct, the Government charged, constituted a fraudulent device in connection with the purchase and sale of securities.[5]

## B

We agree with the Government that misappropriation, as just defined, satisfies § 10(b)'s requirement that chargeable conduct involve a "deceptive device or contrivance" used "in connection with" the purchase or sale of securities. We observe, first, that misappropriators, as the Government describes them, deal in deception. A fiduciary who "[pretends] loyalty to the principal while secretly converting the principal's information for personal gain," Brief for United States

---

[5] The Government could not have prosecuted O'Hagan under the classical theory, for O'Hagan was not an "insider" of Pillsbury, the corporation in whose stock he traded. Although an "outsider" with respect to Pillsbury, O'Hagan had an intimate association with, and was found to have traded on confidential information from, Dorsey & Whitney, counsel to tender offeror Grand Met. Under the misappropriation theory, O'Hagan's securities trading does not escape Exchange Act sanction, as it would under JUSTICE THOMAS' dissenting view, simply because he was associated with, and gained nonpublic information from, the bidder, rather than the target.

17, "dupes" or defrauds the principal. See Aldave, Misappropriation: A General Theory of Liability for Trading on Nonpublic Information, 13 Hofstra L. Rev. 101, 119 (1984).

We addressed fraud of the same species in *Carpenter* v. *United States,* 484 U. S. 19 (1987), which involved the mail fraud statute's proscription of "any scheme or artifice to defraud," 18 U. S. C. § 1341. Affirming convictions under that statute, we said in *Carpenter* that an employee's undertaking not to reveal his employer's confidential information "became a sham" when the employee provided the information to his co-conspirators in a scheme to obtain trading profits. 484 U. S., at 27. A company's confidential information, we recognized in *Carpenter,* qualifies as property to which the company has a right of exclusive use. *Id.,* at 25–27. The undisclosed misappropriation of such information, in violation of a fiduciary duty, the Court said in *Carpenter,* constitutes fraud akin to embezzlement—"'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.'" *Id.,* at 27 (quoting *Grin* v. *Shine,* 187 U. S. 181, 189 (1902)); see Aldave, 13 Hofstra L. Rev., at 119. *Carpenter*'s discussion of the fraudulent misuse of confidential information, the Government notes, "is a particularly apt source of guidance here, because [the mail fraud statute] (like Section 10(b)) has long been held to require deception, not merely the breach of a fiduciary duty." Brief for United States 18, n. 9 (citation omitted).

Deception through nondisclosure is central to the theory of liability for which the Government seeks recognition. As counsel for the Government stated in explanation of the theory at oral argument: "To satisfy the common law rule that a trustee may not use the property that [has] been entrusted [to] him, there would have to be consent. To satisfy the requirement of the Securities Act that there be no deception, there would only have to be disclosure." Tr. of Oral Arg. 12; see generally Restatement (Second) of Agency §§ 390, 395

(1958) (agent's disclosure obligation regarding use of confidential information).[6]

The misappropriation theory advanced by the Government is consistent with *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462 (1977), a decision underscoring that § 10(b) is not an all-purpose breach of fiduciary duty ban; rather, it trains on conduct involving manipulation or deception. See *id.*, at 473–476. In contrast to the Government's allegations in this case, in *Santa Fe Industries*, all pertinent facts were disclosed by the persons charged with violating § 10(b) and Rule 10b–5, see *id.*, at 474; therefore, there was no deception through nondisclosure to which liability under those provisions could attach, see *id.*, at 476. Similarly, full disclosure forecloses liability under the misappropriation theory: Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no "deceptive device" and thus no § 10(b) violation—although the fiduciary-turned-trader may remain liable under state law for breach of a duty of loyalty.[7]

We turn next to the § 10(b) requirement that the misappropriator's deceptive use of information be "in connection with

---

[6] Under the misappropriation theory urged in this case, the disclosure obligation runs to the source of the information, here, Dorsey & Whitney and Grand Met. Chief Justice Burger, dissenting in *Chiarella*, advanced a broader reading of § 10(b) and Rule 10b–5; the disclosure obligation, as he envisioned it, ran to those with whom the misappropriator trades. 445 U. S., at 240 ("a person who has misappropriated nonpublic information has an absolute duty to disclose that information or to refrain from trading"); see also *id.*, at 243, n. 4. The Government does not propose that we adopt a misappropriation theory of that breadth.

[7] Where, however, a person trading on the basis of material, nonpublic information owes a duty of loyalty and confidentiality to two entities or persons—for example, a law firm and its client—but makes disclosure to only one, the trader may still be liable under the misappropriation theory.

the purchase or sale of [a] security." This element is satisfied because the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities. The securities transaction and the breach of duty thus coincide. This is so even though the person or entity defrauded is not the other party to the trade, but is, instead, the source of the nonpublic information. See Aldave, 13 Hofstra L. Rev., at 120 ("a fraud or deceit can be practiced on one person, with resultant harm to another person or group of persons"). A misappropriator who trades on the basis of material, nonpublic information, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public. See id., at 120–121, and n. 107.

The misappropriation theory targets information of a sort that misappropriators ordinarily capitalize upon to gain no-risk profits through the purchase or sale of securities. Should a misappropriator put such information to other use, the statute's prohibition would not be implicated. The theory does not catch all conceivable forms of fraud involving confidential information; rather, it catches fraudulent means of capitalizing on such information through securities transactions.

The Government notes another limitation on the forms of fraud § 10(b) reaches: "The misappropriation theory would not . . . apply to a case in which a person defrauded a bank into giving him a loan or embezzled cash from another, and then used the proceeds of the misdeed to purchase securities." Brief for United States 24, n. 13. In such a case, the Government states, "the proceeds would have value to the malefactor apart from their use in a securities transaction, and the fraud would be complete as soon as the money was obtained." Ibid. In other words, money can buy, if not anything, then at least many things; its misappropriation

may thus be viewed as sufficiently detached from a subsequent securities transaction that § 10(b)'s "in connection with" requirement would not be met. *Ibid.*

JUSTICE THOMAS' charge that the misappropriation theory is incoherent because information, like funds, can be put to multiple uses, see *post*, at 681–686 (opinion concurring in judgment in part and dissenting in part), misses the point. The Exchange Act was enacted in part "to insure the maintenance of fair and honest markets," 15 U. S. C. § 78b, and there is no question that fraudulent uses of confidential information fall within § 10(b)'s prohibition if the fraud is "in connection with" a securities transaction. It is hardly remarkable that a rule suitably applied to the fraudulent uses of certain kinds of information would be stretched beyond reason were it applied to the fraudulent use of money.

JUSTICE THOMAS does catch the Government in overstatement. Observing that money can be used for all manner of purposes and purchases, the Government urges that confidential information of the kind at issue derives its value *only* from its utility in securities trading. See Brief for United States 10, 21; *post*, at 683–684 (several times emphasizing the word "only"). Substitute "ordinarily" for "only," and the Government is on the mark.[8]

---

[8] JUSTICE THOMAS' evident struggle to invent other uses to which O'Hagan plausibly might have put the nonpublic information, see *post*, at 685, is telling. It is imaginative to suggest that a trade journal would have paid O'Hagan dollars in the millions to publish his information. See Tr. of Oral Arg. 36–37. Counsel for O'Hagan hypothesized, as a nontrading use, that O'Hagan could have "misappropriat[ed] this information of [his] law firm and its client, deliver[ed] it to [Pillsbury], and suggest[ed] that [Pillsbury] in the future . . . might find it very desirable to use [O'Hagan] for legal work." *Id.*, at 37. But Pillsbury might well have had large doubts about engaging for its legal work a lawyer who so stunningly displayed his readiness to betray a client's confidence. Nor is the Commission's theory "incoherent" or "inconsistent," *post*, at 680, 692, for failing to inhibit use of confidential information for "personal amusement . . . in a fantasy stock trading game," *post*, at 685.

Our recognition that the Government's "only" is an over-statement has provoked the dissent to cry "new theory." See *post*, at 687–689. But the very case on which JUSTICE THOMAS relies, *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29 (1983), shows the extremity of that charge. In *State Farm*, we reviewed an agency's rescission of a rule under the same "arbitrary and capricious" standard by which the promulgation of a rule under the relevant statute was to be judged, see *id.*, at 41–42; in our decision concluding that the agency had not adequately explained its regulatory action, see *id.*, at 57, we cautioned that a "reviewing court should not attempt itself to make up for such deficiencies," *id.*, at 43. Here, by contrast, Rule 10b–5's promulgation has not been challenged; we consider only the Government's charge that O'Hagan's alleged fraudulent conduct falls within the prohibitions of the Rule and § 10(b). In this context, we acknowledge simply that, in defending the Government's interpretation of the Rule and statute in this Court, the Government's lawyers have pressed a solid point too far, something lawyers, occasionally even judges, are wont to do.

The misappropriation theory comports with § 10(b)'s language, which requires deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller. The theory is also well tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence. See 45 Fed. Reg. 60412 (1980) (trading on misappropriated information "undermines the integrity of, and investor confidence in, the securities markets"). Although informational disparity is inevitable in the securities markets, investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law. An investor's informational disadvantage vis-à-vis a misappropriator with material, nonpublic in-

formation stems from contrivance, not luck; it is a disadvantage that cannot be overcome with research or skill.    See Brudney, Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws, 93 Harv. L. Rev. 322, 356 (1979) ("If the market is thought to be systematically populated with . . . transactors [trading on the basis of misappropriated information] some investors will refrain from dealing altogether, and others will incur costs to avoid dealing with such transactors or corruptly to overcome their unerodable informational advantages."); Aldave, 13 Hofstra L. Rev., at 122–123.

In sum, considering the inhibiting impact on market participation of trading on misappropriated information, and the congressional purposes underlying § 10(b), it makes scant sense to hold a lawyer like O'Hagan a § 10(b) violator if he works for a law firm representing the target of a tender offer, but not if he works for a law firm representing the bidder.    The text of the statute requires no such result.[9] The misappropriation at issue here was properly made the subject of a § 10(b) charge because it meets the statutory requirement that there be "deceptive" conduct "in connection with" securities transactions.

---

[9] As noted earlier, however, see *supra,* at 654–655, the textual requirement of deception precludes § 10(b) liability when a person trading on the basis of nonpublic information has disclosed his trading plans to, or obtained authorization from, the principal—even though such conduct may affect the securities markets in the same manner as the conduct reached by the misappropriation theory.    Contrary to JUSTICE THOMAS' suggestion, see *post,* at 689–691, the fact that § 10(b) is only a partial antidote to the problems it was designed to alleviate does not call into question its prohibition of conduct that falls within its textual proscription.    Moreover, once a disloyal agent discloses his imminent breach of duty, his principal may seek appropriate equitable relief under state law.    Furthermore, in the context of a tender offer, the principal who authorizes an agent's trading on confidential information may, in the Commission's view, incur liability for an Exchange Act violation under Rule 14e–3(a).

## C

The Court of Appeals rejected the misappropriation theory primarily on two grounds. First, as the Eighth Circuit comprehended the theory, it requires neither misrepresentation nor nondisclosure. See 92 F. 3d, at 618. As we just explained, however, see *supra*, at 654–655, deceptive nondisclosure is essential to the § 10(b) liability at issue. Concretely, in this case, "it [was O'Hagan's] failure to disclose his personal trading to Grand Met and Dorsey, in breach of his duty to do so, that ma[de] his conduct 'deceptive' within the meaning of [§ ]10(b)." Reply Brief 7.

Second and "more obvious," the Court of Appeals said, the misappropriation theory is not moored to § 10(b)'s requirement that "the fraud be 'in connection with the purchase or sale of any security.'" 92 F. 3d, at 618 (quoting 15 U. S. C. § 78j(b)). According to the Eighth Circuit, three of our decisions reveal that § 10(b) liability cannot be predicated on a duty owed to the source of nonpublic information: *Chiarella* v. *United States*, 445 U. S. 222 (1980); *Dirks* v. *SEC*, 463 U. S. 646 (1983); and *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994). "[O]nly a breach of a duty to parties to the securities transaction," the Court of Appeals concluded, "or, at the most, to other market participants such as investors, will be sufficient to give rise to § 10(b) liability." 92 F. 3d, at 618. We read the statute and our precedent differently, and note again that § 10(b) refers to "the purchase or sale of any security," not to identifiable purchasers or sellers of securities.

*Chiarella* involved securities trades by a printer employed at a shop that printed documents announcing corporate takeover bids. See 445 U. S., at 224. Deducing the names of target companies from documents he handled, the printer bought shares of the targets before takeover bids were announced, expecting (correctly) that the share prices would rise upon announcement. In these transactions, the printer did not disclose to the sellers of the securities (the target

companies' shareholders) the nonpublic information on which he traded.  See *ibid.*  For that trading, the printer was convicted of violating § 10(b) and Rule 10b–5.  We reversed the Court of Appeals judgment that had affirmed the conviction. See *id.*, at 225.

The jury in *Chiarella* had been instructed that it could convict the defendant if he willfully failed to inform sellers of target company securities that he knew of a takeover bid that would increase the value of their shares.  See *id.*, at 226.  Emphasizing that the printer had no agency or other fiduciary relationship with the sellers, we held that liability could not be imposed on so broad a theory.  See *id.*, at 235. There is under § 10(b), we explained, no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information."  *Id.*, at 233. Under established doctrine, we said, a duty to disclose or abstain from trading "arises from a specific relationship between two parties."  *Ibid.*

The Court did not hold in *Chiarella* that the *only* relationship prompting liability for trading on undisclosed information is the relationship between a corporation's insiders and shareholders.  That is evident from our response to the Government's argument before this Court that the printer's misappropriation of information from his employer for purposes of securities trading—in violation of a duty of confidentiality owed to the acquiring companies—constituted fraud in connection with the purchase or sale of a security, and thereby satisfied the terms of § 10(b).  *Id.*, at 235–236.  The Court declined to reach that potential basis for the printer's liability, because the theory had not been submitted to the jury. See *id.*, at 236–237.  But four Justices found merit in it. See *id.*, at 239 (Brennan, J., concurring in judgment); *id.*, at 240–243 (Burger, C. J., dissenting); *id.*, at 245 (Blackmun, J., joined by Marshall, J., dissenting).  And a fifth Justice stated that the Court "wisely le[ft] the resolution of this issue for another day."  *Id.*, at 238 (STEVENS, J., concurring).

*Chiarella* thus expressly left open the misappropriation theory before us today. Certain statements in *Chiarella,* however, led the Eighth Circuit in the instant case to conclude that § 10(b) liability hinges exclusively on a breach of duty owed to a purchaser or seller of securities. See 92 F. 3d, at 618. The Court said in *Chiarella* that § 10(b) liability "is premised upon a duty to disclose arising from a relationship of trust and confidence *between parties to a transaction,*" 445 U. S., at 230 (emphasis added), and observed that the printshop employee defendant in that case "was not a person in whom the sellers had placed their trust and confidence," see *id.,* at 232. These statements rejected the notion that § 10(b) stretches so far as to impose "a general duty between all participants in market transactions to forgo actions based on material, nonpublic information," *id.,* at 233, and we confine them to that context. The statements highlighted by the Eighth Circuit, in short, appear in an opinion carefully leaving for future resolution the validity of the misappropriation theory, and therefore cannot be read to foreclose that theory.

*Dirks,* too, left room for application of the misappropriation theory in cases like the one we confront.[10] *Dirks* involved an investment analyst who had received information from a former insider of a corporation with which the analyst had no connection. See 463 U. S., at 648–649. The information indicated that the corporation had engaged in a massive fraud. The analyst investigated the fraud, obtaining corroborating information from employees of the corporation. During his investigation, the analyst discussed his findings with clients and investors, some of whom sold their holdings in the company the analyst suspected of gross wrongdoing. See *id.,* at 649.

---

[10] The Eighth Circuit's conclusion to the contrary was based in large part on *Dirks*'s reiteration of the *Chiarella* language quoted and discussed above. See 92 F. 3d 612, 618–619 (1996).

The SEC censured the analyst for, *inter alia*, aiding and abetting § 10(b) and Rule 10b–5 violations by clients and investors who sold their holdings based on the nonpublic information the analyst passed on. See *id.*, at 650–652. In the SEC's view, the analyst, as a "tippee" of corporation insiders, had a duty under § 10(b) and Rule 10b–5 to refrain from communicating the nonpublic information to persons likely to trade on the basis of it. See *id.*, at 651, 655–656. This Court found no such obligation, see *id.*, at 665–667, and repeated the key point made in *Chiarella:* There is no " 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information.' " 463 U. S., at 655 (quoting *Chiarella*, 445 U. S., at 233); see Aldave, 13 Hofstra L. Rev., at 122 (misappropriation theory bars only "trading on the basis of information that the wrongdoer converted to his own use in violation of some fiduciary, contractual, or similar obligation to the owner or rightful possessor of the information").

No showing had been made in *Dirks* that the "tippers" had violated any duty by disclosing to the analyst nonpublic information about their former employer. The insiders had acted not for personal profit, but to expose a massive fraud within the corporation. See 463 U. S., at 666–667. Absent any violation by the tippers, there could be no derivative liability for the tippee. See *id.*, at 667. Most important for purposes of the instant case, the Court observed in *Dirks:* "There was no expectation by [the analyst's] sources that he would keep their information in confidence. Nor did [the analyst] misappropriate or illegally obtain the information . . . ." *Id.*, at 665. *Dirks* thus presents no suggestion that a person who gains nonpublic information through misappropriation in breach of a fiduciary duty escapes § 10(b) liability when, without alerting the source, he trades on the information.

Last of the three cases the Eighth Circuit regarded as warranting disapproval of the misappropriation theory, *Cen-*

*tral Bank* held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." 511 U. S., at 191. We immediately cautioned in *Central Bank* that secondary actors in the securities markets may sometimes be chargeable under the securities Acts: "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) *on which a purchaser or seller of securities relies* may be liable as a primary violator under 10b–5, assuming . . . the requirements for primary liability under Rule 10b–5 are met." *Ibid.* (emphasis added). The Eighth Circuit isolated the statement just quoted and drew from it the conclusion that § 10(b) covers only deceptive statements or omissions on which purchasers and sellers, and perhaps other market participants, rely. See 92 F. 3d, at 619. It is evident from the question presented in *Central Bank*, however, that this Court, in the quoted passage, sought only to clarify that secondary actors, although not subject to aiding and abetting liability, remain subject to primary liability under § 10(b) and Rule 10b–5 for certain conduct.

Furthermore, *Central Bank*'s discussion concerned only private civil litigation under § 10(b) and Rule 10b–5, not criminal liability. *Central Bank*'s reference to purchasers or sellers of securities must be read in light of a longstanding limitation on private § 10(b) suits. In *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975), we held that only actual purchasers or sellers of securities may maintain a private civil action under § 10(b) and Rule 10b–5. We so confined the § 10(b) private right of action because of "policy considerations." *Id.*, at 737. In particular, *Blue Chip Stamps* recognized the abuse potential and proof problems inherent in suits by investors who neither bought nor sold, but asserted they would have traded absent fraudulent conduct by others. See *id.*, at 739–747; see also *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 285

(1992) (O'CONNOR, J., concurring in part and concurring in judgment); *id.*, at 289–290 (SCALIA, J., concurring in judgment). Criminal prosecutions do not present the dangers the Court addressed in *Blue Chip Stamps*, so that decision is "inapplicable" to indictments for violations of §10(b) and Rule 10b–5. *United States* v. *Naftalin*, 441 U. S. 768, 774, n. 6 (1979); see also *Holmes*, 503 U. S., at 281 (O'CONNOR, J., concurring in part and concurring in judgment) ("[T]he purchaser/seller standing requirement for private civil actions under §10(b) and Rule 10b–5 is of no import in criminal prosecutions for willful violations of those provisions.").

In sum, the misappropriation theory, as we have examined and explained it in this opinion, is both consistent with the statute and with our precedent.[11] Vital to our decision that criminal liability may be sustained under the misappropriation theory, we emphasize, are two sturdy safeguards Congress has provided regarding scienter. To establish a criminal violation of Rule 10b–5, the Government must prove that a person "willfully" violated the provision. See 15 U. S. C.

---

[11] The United States additionally argues that Congress confirmed the validity of the misappropriation theory in the Insider Trading and Securities Fraud Enforcement Act of 1988 (ITSFEA), §2(1), 102 Stat. 4677, note following 15 U. S. C. §78u–1. See Brief for United States 32–35. ITSFEA declares that "the rules and regulations of the Securities and Exchange Commission under the Securities Exchange Act of 1934 . . . governing trading while in possession of material, nonpublic information are, as required by such Act, necessary and appropriate in the public interest and for the protection of investors." Note following 15 U. S. C. §78u–1. ITSFEA also includes a new §20A(a) of the Exchange Act expressly providing a private cause of action against persons who violate the Exchange Act "by purchasing or selling a security while in possession of material, nonpublic information"; such an action may be brought by "any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class." 15 U. S. C. §78t–1(a). Because we uphold the misappropriation theory on the basis of §10(b) itself, we do not address ITSFEA's significance for cases of this genre.

§ 78ff(a).[12]   Furthermore, a defendant may not be imprisoned for violating Rule 10b–5 if he proves that he had no knowledge of the Rule.   See *ibid.*[13]   O'Hagan's charge that the misappropriation theory is too indefinite to permit the imposition of criminal liability, see Brief for Respondent 30–33, thus fails not only because the theory is limited to those who breach a recognized duty.   In addition, the statute's "requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the [statute]" in circumstances such as O'Hagan's is unjust.   *Boyce Motor Lines, Inc.* v. *United States,* 342 U. S. 337, 342 (1952).

The Eighth Circuit erred in holding that the misappropriation theory is inconsistent with § 10(b).   The Court of Appeals may address on remand O'Hagan's other challenges to his convictions under § 10(b) and Rule 10b–5.

### III

We consider next the ground on which the Court of Appeals reversed O'Hagan's convictions for fraudulent trading in connection with a tender offer, in violation of § 14(e) of the Exchange Act and SEC Rule 14e–3(a).   A sole question is before us as to these convictions: Did the Commission, as the Court of Appeals held, exceed its rulemaking authority under § 14(e) when it adopted Rule 14e–3(a) without requiring a showing that the trading at issue entailed a breach of

---

[12] In relevant part, § 32 of the Exchange Act, as set forth in 15 U. S. C. § 78ff(a), provides:

"Any person who willfully violates any provision of this chapter . . . or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter . . . shall upon conviction be fined not more than $1,000,000, or imprisoned not more than 10 years, or both . . . ; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation."

[13] The statute provides no such defense to imposition of monetary fines. See *ibid.*

fiduciary duty? We hold that the Commission, in this regard and to the extent relevant to this case, did not exceed its authority.

The governing statutory provision, § 14(e) of the Exchange Act, reads in relevant part:

> "It shall be unlawful for any person . . . to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer. . . . The [SEC] shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." 15 U. S. C. § 78n(e).

Section 14(e)'s first sentence prohibits fraudulent acts in connection with a tender offer. This self-operating proscription was one of several provisions added to the Exchange Act in 1968 by the Williams Act, 82 Stat. 454. The section's second sentence delegates definitional and prophylactic rulemaking authority to the Commission. Congress added this rulemaking delegation to § 14(e) in 1970 amendments to the Williams Act. See § 5, 84 Stat. 1497.

Through § 14(e) and other provisions on disclosure in the Williams Act,[14] Congress sought to ensure that shareholders "confronted by a cash tender offer for their stock [would] not be required to respond without adequate information." *Rondeau* v. *Mosinee Paper Corp.*, 422 U. S. 49, 58 (1975); see *Lewis* v. *McGraw*, 619 F. 2d 192, 195 (CA2 1980) *(per curiam)*

---

[14] In addition to § 14(e), the Williams Act and the 1970 amendments added to the Exchange Act the following provisions concerning disclosure: § 13(d), 15 U. S. C. § 78m(d) (disclosure requirements for persons acquiring more than five percent of certain classes of securities); § 13(e), 15 U. S. C. § 78m(e) (authorizing Commission to adopt disclosure requirements for certain repurchases of securities by issuer); § 14(d), 15 U. S. C. § 78n(d) (disclosure requirements when tender offer results in offeror owning more than five percent of a class of securities); § 14(f), 15 U. S. C. § 78n(f) (disclosure requirements when tender offer results in new corporate directors constituting a majority).

("very purpose" of Williams Act was "informed decision-making by shareholders"). As we recognized in *Schreiber* v. *Burlington Northern, Inc.*, 472 U. S. 1 (1985), Congress designed the Williams Act to make "disclosure, rather than court-imposed principles of 'fairness' or 'artificiality,' . . . the preferred method of market regulation." *Id.*, at 9, n. 8. Section 14(e), we explained, "supplements the more precise disclosure provisions found elsewhere in the Williams Act, while requiring disclosure more explicitly addressed to the tender offer context than that required by § 10(b)." *Id.*, at 10–11.

Relying on § 14(e)'s rulemaking authorization, the Commission, in 1980, promulgated Rule 14e–3(a). That measure provides:

"(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the 'offering person'), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the [Exchange] Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

"(1) The offering person,

"(2) The issuer of the securities sought or to be sought by such tender offer, or

"(3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source

are publicly disclosed by press release or otherwise."
17 CFR § 240.14e–3(a) (1996).

As characterized by the Commission, Rule 14e–3(a) is a "disclose or abstain from trading" requirement. 45 Fed. Reg. 60410 (1980).[15] The Second Circuit concisely described the Rule's thrust:

> "One violates Rule 14e–3(a) if he trades on the basis. of material nonpublic information concerning a pending tender offer that he knows or has reason to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf. Rule 14e–3(a) is a disclosure provision. It creates a duty in those traders who fall within its ambit to abstain or disclose, *without regard to whether the trader owes a pre-existing fiduciary duty* to respect the confidentiality of the information." *United States* v. *Chestman*, 947 F. 2d 551, 557 (1991) (en banc) (emphasis added), cert. denied, 503 U. S. 1004 (1992).

See also *SEC* v. *Maio*, 51 F. 3d 623, 635 (CA7 1995) ("Rule 14e–3 creates a duty to disclose material non-public information, or abstain from trading in stocks implicated by an impending tender offer, *regardless of whether such information was obtained through a breach of fiduciary duty.*" (emphasis added)); *SEC* v. *Peters*, 978 F. 2d 1162, 1165 (CA10 1992) (as written, Rule 14e–3(a) has no fiduciary duty requirement).

In the Eighth Circuit's view, because Rule 14e–3(a) applies whether or not the trading in question breaches a fiduciary duty, the regulation exceeds the SEC's § 14(e) rulemaking authority. See 92 F. 3d, at 624, 627. Contra, *Maio*, 51 F. 3d, at 634–635 (CA7); *Peters*, 978 F. 2d, at 1165–1167 (CA10);

---

[15] The Rule thus adopts for the tender offer context a requirement resembling the one Chief Justice Burger would have adopted in *Chiarella* for misappropriators under § 10(b). See *supra*, at 655, n. 6.

*Chestman*, 947 F. 2d, at 556–563 (CA2) (all holding Rule 14e–3(a) a proper exercise of SEC's statutory authority). In support of its holding, the Eighth Circuit relied on the text of § 14(e) and our decisions in *Schreiber* and *Chiarella*. See 92 F. 3d, at 624–627.

The Eighth Circuit homed in on the essence of § 14(e)'s rulemaking authorization: "[T]he statute empowers the SEC to 'define' and 'prescribe means reasonably designed to prevent' 'acts and practices' which are 'fraudulent.'" *Id.*, at 624. All that means, the Eighth Circuit found plain, is that the SEC may "identify and regulate," in the tender offer context, "acts and practices" the law already defines as "fraudulent"; but, the Eighth Circuit maintained, the SEC may not "create its own definition of fraud." *Ibid.* (internal quotation marks omitted).

This Court, the Eighth Circuit pointed out, held in *Schreiber* that the word "manipulative" in the § 14(e) phrase "fraudulent, deceptive, or manipulative acts or practices" means just what the word means in § 10(b): Absent misrepresentation or nondisclosure, an act cannot be indicted as manipulative. See 92 F. 3d, at 625 (citing *Schreiber*, 472 U. S., at 7–8, and n. 6). Section 10(b) interpretations guide construction of § 14(e), the Eighth Circuit added, see 92 F. 3d, at 625, citing this Court's acknowledgment in *Schreiber* that § 14(e)'s "'broad antifraud prohibition' . . . [is] modeled on the antifraud provisions of § 10(b) . . . and Rule 10b–5," 472 U. S., at 10 (citation omitted); see *id.*, at 10–11, n. 10.

For the meaning of "fraudulent" under § 10(b), the Eighth Circuit looked to *Chiarella*. See 92 F. 3d, at 625. In that case, the Eighth Circuit recounted, this Court held that a failure to disclose information could be "fraudulent" under § 10(b) only when there was a duty to speak arising out of "'a fiduciary or other similar relation of trust and confidence.'" *Chiarella*, 445 U. S., at 228 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)). Just as § 10(b) demands a showing

of a breach of fiduciary duty, so such a breach is necessary to make out a § 14(e) violation, the Eighth Circuit concluded.

As to the Commission's § 14(e) authority to "prescribe means reasonably designed to prevent" fraudulent acts, the Eighth Circuit stated: "Properly read, this provision means simply that the SEC has broad regulatory powers in the field of tender offers, but the statutory terms have a fixed meaning which the SEC cannot alter by way of an administrative rule." 92 F. 3d, at 627.

The United States urges that the Eighth Circuit's reading of § 14(e) misapprehends both the Commission's authority to define fraudulent acts and the Commission's power to prevent them. "The 'defining' power," the United States submits, "would be a virtual nullity were the SEC not permitted to go beyond common law fraud (which is separately prohibited in the first [self-operative] sentence of Section 14(e))." Brief for United States 11; see *id.*, at 37.

In maintaining that the Commission's power to define fraudulent acts under § 14(e) is broader than its rulemaking power under § 10(b), the United States questions the Court of Appeals' reading of *Schreiber.* See Brief for United States 38–40. Parenthetically, the United States notes that the word before the *Schreiber* Court was "manipulative"; unlike "fraudulent," the United States observes, "'manipulative' . . . is 'virtually a term of art when used in connection with the securities markets.'" Brief for United States 38, n. 20 (quoting *Schreiber,* 472 U. S., at 6). Most tellingly, the United States submits, *Schreiber* involved acts alleged to violate the self-operative provision in § 14(e)'s first sentence, a sentence containing language similar to § 10(b). But § 14(e)'s second sentence, containing the rulemaking authorization, the United States points out, does not track § 10(b), which simply authorizes the SEC to proscribe "manipulative or deceptive device[s] or contrivance[s]." Brief for United States 38. Instead, § 14(e)'s rulemaking prescription tracks § 15(c)(2)(D) of the Exchange Act, 15 U. S. C. § 78*o*(c)(2)(D),

which concerns the conduct of broker-dealers in over-the-counter markets. See Brief for United States 38–39. Since 1938, see 52 Stat. 1075, § 15(c)(2) has given the Commission authority to "define, and prescribe means reasonably designed to prevent, such [broker-dealer] acts and practices as are fraudulent, deceptive, or manipulative." 15 U. S. C. § 78*o*(c)(2)(D). When Congress added this same rulemaking language to § 14(e) in 1970, the Government states, the Commission had already used its § 15(c)(2) authority to reach beyond common-law fraud. See Brief for United States 39, n. 22.[16]

We need not resolve in this case whether the Commission's authority under § 14(e) to "define . . . such acts and practices as are fraudulent" is broader than the Commission's fraud-defining authority under § 10(b), for we agree with the United States that Rule 14e–3(a), as applied to cases of this genre, qualifies under § 14(e) as a "means reasonably designed to prevent" fraudulent trading on material, nonpublic information in the tender offer context.[17] A prophylactic

---

[16] The Government draws our attention to the following measures: 17 CFR § 240.15c2–1 (1970) (prohibiting a broker-dealer's hypothecation of a customer's securities if hypothecated securities would be commingled with the securities of another customer, absent written consent); § 240.15c2–3 (prohibiting transactions by broker-dealers in unvalidated German securities); § 240.15c2–4 (prohibiting broker-dealers from accepting any part of the sale price of a security being distributed unless the money received is promptly transmitted to the persons entitled to it); § 240.15c2–5 (requiring broker-dealers to provide written disclosure of credit terms and commissions in connection with securities sales in which broker-dealers extend credit, or participate in arranging for loans, to the purchasers). See Brief for United States 39, n. 22.

[17] We leave for another day, when the issue requires decision, the legitimacy of Rule 14e–3(a) as applied to "warehousing," which the Government describes as "the practice by which bidders leak advance information of a tender offer to allies and encourage them to purchase the target company's stock before the bid is announced." Reply Brief 17. As we observed in *Chiarella*, one of the Commission's purposes in proposing Rule 14e–3(a)

measure, because its mission is to prevent, typically encompasses more than the core activity prohibited. As we noted in *Schreiber*, § 14(e)'s rulemaking authorization gives the Commission "latitude," even in the context of a term of art like "manipulative," "to regulate nondeceptive activities as a 'reasonably designed' means of preventing manipulative acts, without suggesting any change in the meaning of the term 'manipulative' itself." 472 U. S., at 11, n. 11. We hold, accordingly, that under § 14(e), the Commission may prohibit acts not themselves fraudulent under the common law or § 10(b), if the prohibition is "reasonably designed to prevent . . . acts and practices [that] are fraudulent." 15 U. S. C. § 78n(e).[18]

Because Congress has authorized the Commission, in § 14(e), to prescribe legislative rules, we owe the Commission's judgment "more than mere deference or weight." *Batterton* v. *Francis*, 432 U. S. 416, 424–426 (1977). Therefore, in determining whether Rule 14e–3(a)'s "disclose or abstain from trading" requirement is reasonably designed to prevent fraudulent acts, we must accord the Commission's assessment "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984). In this case, we conclude, the Commission's assessment is none of these.[19]

---

was "to bar warehousing under its authority to regulate tender offers." 445 U. S., at 234. The Government acknowledges that trading authorized by a principal breaches no fiduciary duty. See Reply Brief 17. The instant case, however, does not involve trading authorized by a principal; therefore, we need not here decide whether the Commission's proscription of warehousing falls within its § 14(e) authority to define or prevent fraud.

[18] The Commission's power under § 10(b) is more limited. See *supra*, at 651 (Rule 10b–5 may proscribe only conduct that § 10(b) prohibits).

[19] JUSTICE THOMAS' dissent urges that the Commission must be precise about the authority it is exercising—that it must say whether it is acting to "define" or to "prevent" fraud—and that in this instance it has pur-

In adopting the "disclose or abstain" rule, the SEC explained:

> "The Commission has previously expressed and continues to have serious concerns about trading by persons in possession of material, nonpublic information relating to a tender offer.   This practice results in unfair disparities in market information and market disruption.   Security holders who purchase from or sell to such persons are effectively denied the benefits of disclosure and the substantive protections of the Williams Act.   If furnished with the information, these security holders would be able to make an informed investment decision, which could involve deferring the purchase or sale of the securities until the material information had been disseminated or until the tender offer had been commenced or terminated."   45 Fed. Reg. 60412 (1980) (footnotes omitted).

The Commission thus justified Rule 14e–3(a) as a means necessary and proper to assure the efficacy of Williams Act protections.

The United States emphasizes that Rule 14e–3(a) reaches trading in which "a breach of duty is likely but difficult to prove."   Reply Brief 16.   "Particularly in the context of a tender offer," as the Tenth Circuit recognized, "there is a fairly wide circle of people with confidential information," *Peters*, 978 F. 2d, at 1167, notably, the attorneys, investment

---

ported only to define, not to prevent.  See *post*, at 696.  JUSTICE THOMAS sees this precision in Rule 14e–3(a)'s words: "it shall constitute a fraudulent . . . act . . . within the meaning of section 14(e) . . . ."  We do not find the Commission's Rule vulnerable for failure to recite as a regulatory preamble: We hereby exercise our authority to "define, and prescribe means reasonably designed to prevent, . . . [fraudulent] acts."  Sensibly read, the Rule is an exercise of the Commission's full authority.  Logically and practically, such a rule may be conceived and defended, alternatively, as definitional or preventive.

bankers, and accountants involved in structuring the transaction. The availability of that information may lead to abuse, for "even a hint of an upcoming tender offer may send the price of the target company's stock soaring." *SEC* v. *Materia*, 745 F. 2d 197, 199 (CA2 1984). Individuals entrusted with nonpublic information, particularly if they have no long-term loyalty to the issuer, may find the temptation to trade on that information hard to resist in view of "the very large short-term profits potentially available [to them]." *Peters*, 978 F. 2d, at 1167.

"[I]t may be possible to prove circumstantially that a person [traded on the basis of material, nonpublic information], but almost impossible to prove that the trader obtained such information in breach of a fiduciary duty owed either by the trader or by the ultimate insider source of the information." *Ibid.* The example of a "tippee" who trades on information received from an insider illustrates the problem. Under Rule 10b–5, "a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Dirks*, 463 U. S., at 660. To show that a tippee who traded on nonpublic information about a tender offer had breached a fiduciary duty would require proof not only that the insider source breached a fiduciary duty, but that the tippee knew or should have known of that breach. "Yet, in most cases, the only parties to the [information transfer] will be the insider and the alleged tippee." *Peters*, 978 F. 2d, at 1167.[20]

---

[20] JUSTICE THOMAS opines that there is no reason to anticipate difficulties in proving breach of duty in "misappropriation" cases. "Once the source of the [purloined] information has been identified," he asserts, "it should be a simple task to obtain proof of any breach of duty." *Post*, at 697. To test that assertion, assume a misappropriating partner at Dor-

In sum, it is a fair assumption that trading on the basis of material, nonpublic information will often involve a breach of a duty of confidentiality to the bidder or target company or their representatives. The SEC, cognizant of the proof problem that could enable sophisticated traders to escape responsibility, placed in Rule 14e–3(a) a "disclose or abstain from trading" command that does not require specific proof of a breach of fiduciary duty. That prescription, we are satisfied, applied to this case, is a "means reasonably designed to prevent" fraudulent trading on material, nonpublic information in the tender offer context. See *Chestman,* 947 F. 2d, at 560 ("While dispensing with the subtle problems of proof associated with demonstrating fiduciary breach in the problematic area of tender offer insider trading, [Rule 14e–3(a)] retains a close nexus between the prohibited conduct and the statutory aims."); accord, *Maio,* 51 F. 3d, at 635, and n. 14; *Peters,* 978 F. 2d, at 1167.[21] Therefore, insofar as it serves to prevent the type of misappropriation charged against O'Hagan, Rule 14e–3(a) is a proper exercise of the Commission's prophylactic power under § 14(e).[22]

As an alternate ground for affirming the Eighth Circuit's judgment, O'Hagan urges that Rule 14e–3(a) is invalid be-

---

sey & Whitney told his daughter or son and a wealthy friend that a tender for Pillsbury was in the offing, and each tippee promptly purchased Pillsbury stock, the child borrowing the purchase price from the wealthy friend. JUSTICE THOMAS' confidence, *post,* at 698, n. 12, that "there is no reason to suspect that the tipper would gratuitously protect the tippee," seems misplaced.

[21] JUSTICE THOMAS insists that even if the misappropriation of information from the bidder about a tender offer is fraud, the Commission has not explained why such fraud is "in connection with" a tender offer. *Post,* at 697, 698. What else, one can only wonder, might such fraud be "in connection with"?

[22] Repeating the argument it made concerning the misappropriation theory, see *supra,* at 665, n. 11, the United States urges that Congress confirmed Rule 14e–3(a)'s validity in ITSFEA, 15 U. S. C. § 78u–1. See Brief for United States 44–45. We uphold Rule 14e–3(a) on the basis of § 14(e) itself and need not address ITSFEA's relevance to this case.

cause it prohibits trading in advance of a tender offer—when "a substantial step . . . to commence" such an offer has been taken—while § 14(e) prohibits fraudulent acts "in connection with any tender offer." See Brief for Respondent 41–42. O'Hagan further contends that, by covering pre-offer conduct, Rule 14e–3(a) "fails to comport with due process on two levels": The Rule does not "give fair notice as to when, in advance of a tender offer, a violation of § 14(e) occurs," *id.*, at 42; and it "disposes of any scienter requirement," *id.*, at 43. The Court of Appeals did not address these arguments, and O'Hagan did not raise the due process points in his briefs before that court. We decline to consider these contentions in the first instance.[23] The Court of Appeals may address on remand any arguments O'Hagan has preserved.

## IV

Based on its dispositions of the securities fraud convictions, the Court of Appeals also reversed O'Hagan's convictions, under 18 U. S. C. § 1341, for mail fraud. See 92 F. 3d, at 627–628. Reversal of the securities convictions, the Court of Appeals recognized, "d[id] not as a matter of law require that the mail fraud convictions likewise be reversed." *Id.*, at 627 (citing *Carpenter,* 484 U. S., at 24, in which this Court unanimously affirmed mail and wire fraud convictions based on the same conduct that evenly divided the Court on the defendants' securities fraud convictions). But in this case, the Court of Appeals said, the indictment was so structured that the mail fraud charges could not be disassociated from the securities fraud charges, and absent any securities

---

[23] As to O'Hagan's scienter argument, we reiterate that 15 U. S. C. § 78ff(a) requires the Government to prove "willful[l] violat[ion]" of the securities laws, and that lack of knowledge of the relevant rule is an affirmative defense to a sentence of imprisonment. See *supra,* at 665–666.

fraud, "there was no fraud upon which to base the mail fraud charges." 92 F. 3d, at 627–628.[24]

The United States urges that the Court of Appeals' position is irreconcilable with *Carpenter*: Just as in *Carpenter*, so here, the "mail fraud charges are independent of [the] securities fraud charges, even [though] both rest on the same set of facts." Brief for United States 46–47. We need not linger over this matter, for our rulings on the securities fraud issues require that we reverse the Court of Appeals judgment on the mail fraud counts as well.[25]

O'Hagan, we note, attacked the mail fraud convictions in the Court of Appeals on alternate grounds; his other arguments, not yet addressed by the Eighth Circuit, remain open for consideration on remand.

\*   \*   \*

The judgment of the Court of Appeals for the Eighth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[24] The Court of Appeals reversed respondent's money laundering convictions on similar reasoning. See 92 F. 3d, at 628. Because the United States did not seek review of that ruling, we leave undisturbed that portion of the Court of Appeals' judgment.

[25] JUSTICE THOMAS finds O'Hagan's convictions on the mail fraud counts, but not on the securities fraud counts, sustainable. *Post*, at 700–701. Under his view, securities traders like O'Hagan would escape SEC civil actions and federal prosecutions under legislation targeting securities fraud, only to be caught for their trading activities in the broad mail fraud net. If misappropriation theory cases could proceed only under the federal mail and wire fraud statutes, practical consequences for individual defendants might not be large, see Aldave, 49 Ohio St. L. J., at 381, and n. 60; however, "proportionally more persons accused of insider trading [might] be pursued by a U. S. Attorney, and proportionally fewer by the SEC," *id.*, at 382. Our decision, of course, does not rest on such enforcement policy considerations.

JUSTICE SCALIA, concurring in part and dissenting in part.

I join Parts I, III, and IV of the Court's opinion. I do not agree, however, with Part II of the Court's opinion, containing its analysis of respondent's convictions under § 10(b) and Rule 10b–5.

I do not entirely agree with JUSTICE THOMAS's analysis of those convictions either, principally because it seems to me irrelevant whether the Government's theory of why respondent's acts were covered is "coherent and consistent," *post*, at 691. It is true that with respect to matters over which an agency has been accorded adjudicative authority or policy-making discretion, the agency's action must be supported by the reasons that the agency sets forth, *SEC* v. *Chenery Corp.*, 318 U. S. 80, 94 (1943); see also *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196 (1947), but I do not think an agency's unadorned application of the law need be, at least where (as here) no *Chevron* deference is being given to the agency's interpretation, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). In point of fact, respondent's actions either violated § 10(b) and Rule 10b–5, or they did not—regardless of the reasons the Government gave. And it is for us to decide.

While the Court's explanation of the scope of § 10(b) and Rule 10b–5 would be entirely reasonable in some other context, it does not seem to accord with the principle of lenity we apply to criminal statutes (which cannot be mitigated here by the Rule, which is no less ambiguous than the statute). See *Reno* v. *Koray*, 515 U. S. 50, 64–65 (1995) (explaining circumstances in which rule of lenity applies); *United States* v. *Bass*, 404 U. S. 336, 347–348 (1971) (discussing policies underlying rule of lenity). In light of that principle, it seems to me that the unelaborated statutory language: "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," § 10(b), must be construed to require the manipulation or deception of a party to a securities transaction.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE joins, concurring in the judgment in part and dissenting in part.

Today the majority upholds respondent's convictions for violating § 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, based upon the Securities and Exchange Commission's "misappropriation theory." Central to the majority's holding is the need to interpret § 10(b)'s requirement that a deceptive device be "use[d] or employ[ed], in connection with the purchase or sale of any security." 15 U. S. C. § 78j(b). Because the Commission's misappropriation theory fails to provide a coherent and consistent interpretation of this essential requirement for liability under § 10(b), I dissent.

The majority also sustains respondent's convictions under § 14(e) of the Securities Exchange Act, and Rule 14e–3(a) promulgated thereunder, regardless of whether respondent violated a fiduciary duty to anybody. I dissent too from that holding because, while § 14(e) does allow regulations prohibiting nonfraudulent acts as a prophylactic against certain fraudulent acts, neither the majority nor the Commission identifies any relevant underlying fraud against which Rule 14e–3(a) reasonably provides prophylaxis. With regard to respondent's mail fraud convictions, however, I concur in the judgment of the Court.

I

I do not take issue with the majority's determination that the undisclosed misappropriation of confidential information by a fiduciary can constitute a "deceptive device" within the meaning of § 10(b). Nondisclosure where there is a preexisting duty to disclose satisfies our definitions of fraud and deceit for purposes of the securities laws. See *Chiarella* v. *United States*, 445 U. S. 222, 230 (1980).

Unlike the majority, however, I cannot accept the Commission's interpretation of when a deceptive device is "use[d] . . . in connection with" a securities transaction. Although the Commission and the majority at points seem to suggest that

*any* relation to a securities transaction satisfies the "in connection with" requirement of § 10(b), both ultimately reject such an overly expansive construction and require a more integral connection between the fraud and the securities transaction. The majority states, for example, that the misappropriation theory applies to undisclosed misappropriation of confidential information "for securities trading purposes," *ante*, at 652, thus seeming to require a particular intent by the misappropriator in order to satisfy the "in connection with" language. See also *ante*, at 656 (the "misappropriation theory targets information of a sort that misappropriators *ordinarily* capitalize upon to gain no-risk profits through the purchase or sale of securities" (emphasis added)); *ante*, at 656–657 (distinguishing embezzlement of money used to buy securities as lacking the requisite connection). The Commission goes further, and argues that the misappropriation theory satisfies the "in connection with" requirement because it "depends on an *inherent* connection between the deceptive conduct and the purchase or sale of a security." Brief for United States 21 (emphasis added); see also *ibid.* (the "misappropriated information had personal value to respondent *only* because of its utility in securities trading" (emphasis added)).

The Commission's construction of the relevant language in § 10(b), and the incoherence of that construction, become evident as the majority attempts to describe why the fraudulent theft of information falls under the Commission's misappropriation theory, but the fraudulent theft of money does not. The majority correctly notes that confidential information "qualifies as property to which the company has a right of exclusive use." *Ante*, at 654. It then observes that the "undisclosed misappropriation of such information, in violation of a fiduciary duty, . . . constitutes fraud akin to embezzlement—the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another."

*Ibid.* (citations and internal quotation marks omitted).[1] So far the majority's analogy to embezzlement is well taken, and adequately demonstrates that undisclosed misappropriation can be a fraud on the source of the information.

What the embezzlement analogy does not do, however, is explain how the relevant fraud is "use[d] or employ[ed], in connection with" a securities transaction. And when the majority seeks to distinguish the embezzlement of funds from the embezzlement of information, it becomes clear that neither the Commission nor the majority has a coherent theory regarding § 10(b)'s "in connection with" requirement.

Turning first to why embezzlement of information supposedly meets the "in connection with" requirement, the majority asserts that the requirement

> "is satisfied because the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities. The securities transaction and the breach of duty thus coincide." *Ante,* at 656.

The majority later notes, with apparent approval, the Government's contention that the embezzlement of funds used to purchase securities would *not* fall within the misappropriation theory. *Ante,* at 656–657 (citing Brief for United States 24, n. 13). The misappropriation of funds used for a securities transaction is not covered by its theory, the Government explains, because "the proceeds would have value to the malefactor apart from their use in a securities transaction, and the fraud would be complete as soon as the money was

---

[1] Of course, the "use" to which one puts misappropriated property need not be one designed to bring profit to the misappropriator: Any "fraudulent appropriation to one's own use" constitutes embezzlement, regardless of what the embezzler chooses to do with the money. See, *e. g., Logan* v. *State,* 493 P. 2d 842, 846 (Okla. Crim. App. 1972) ("Any diversion of funds held in trust constitutes embezzlement whether there is direct personal benefit or not as long as the owner is deprived of his money").

obtained." Brief for United States 24, n. 13; see *ante*, at 656 (quoting Government's explanation).

Accepting the Government's description of the scope of its own theory, it becomes plain that the majority's explanation of how the misappropriation theory supposedly satisfies the "in connection with" requirement is incomplete. The touchstone required for an embezzlement to be "use[d] or employ[ed], in connection with" a securities transaction is not merely that it "coincide" with, or be consummated by, the transaction, but that it is *necessarily* and *only* consummated by the transaction. Where the property being embezzled has value "apart from [its] use in a securities transaction"— even though it is in fact being used in a securities transaction—the Government contends that there is no violation under the misappropriation theory.

My understanding of the Government's proffered theory of liability, and its construction of the "in connection with" requirement, is confirmed by the Government's explanation during oral argument:

> "[Court]: What if I appropriate some of my client's money in order to buy stock?
>
> .      .      .      .      .
>
> "[Court]: Have I violated the securities laws?
> "[Counsel]: I do not think that you have.
> "[Court]: Why not? Isn't that in connection with the purchase of securit[ies] just as much as this one is?
> "[Counsel]: It's not just as much as this one is, because in this case it is the use of the information that enables the profits, pure and simple. There would be no opportunity to engage in profit—
> "[Court]: Same here. I didn't have the money. The only way I could buy this stock was to get the money.
>
> .      .      .      .      .
>
> "[Counsel]: The difference . . . is that once you have the money you can do anything you want with it. In a sense, the fraud is complete at that point, and then you

go on and you can use the money to finance any number of other activities, but *the connection is far less close than in this case, where the only value of this information for personal profit for respondent was to take it and profit in the securities markets by trading on it.*

.          .          .          .          .

"[Court]: So what you're saying is, is in this case the misappropriation can only be of relevance, or is of substantial relevance, is with reference to the purchase of securities.

"[Counsel]: Exactly.

"[Court]: When you take the money out of the accounts you can go to the racetrack, or whatever.

"[Counsel]: That's exactly right, and because of that difference, [there] can be no doubt that this kind of misappropriation of property is in connection with the purchase or sale of securities.

"Other kinds of misappropriation of property may or may not, but this is a unique form of fraud, unique to the securities markets, in fact, because *the only way in which respondent could have profited through this information is by either trading on it or by tipping somebody else to enable their trades."* Tr. of Oral Arg. 16–19 (emphases added).

As the above exchange demonstrates, the relevant distinction is not that the misappropriated information *was* used for a securities transaction (the money example met that test), but rather that it could *only* be used for such a transaction. See also *id.,* at 6–7 (Government contention that the misappropriation theory satisfies "the requisite connection between the fraud and the securities trading, because it is *only* in the trading that the fraud is consummated" (emphasis added)); *id.,* at 8 (same).

The Government's construction of the "in connection with" requirement—and its claim that such requirement precludes coverage of financial embezzlement—also demonstrates how

the majority's described distinction of financial embezzle-
ment is incomplete. Although the majority claims that the
fraud in a financial embezzlement case is complete as soon as
the money is obtained, and before the securities transaction
is consummated, that is not uniformly true, and thus cannot
be the Government's basis for claiming that such embezzle-
ment does not violate the securities laws. It is not difficult
to imagine an embezzlement of money that takes place via
the mechanism of a securities transaction—for example
where a broker is directed to purchase stock for a client and
instead purchases such stock—using client funds—for his
own account. The unauthorized (and presumably undis-
closed) transaction is the very act that constitutes the em-
bezzlement and the "securities transaction and the breach of
duty thus coincide." What presumably distinguishes mone-
tary embezzlement for the Government is thus that it is not
*necessarily* coincident with a securities transaction, not that
it *never* lacks such a "connection."

Once the Government's construction of the misappropria-
tion theory is accurately described and accepted—along with
its implied construction of § 10(b)'s "in connection with" lan-
guage—that theory should no longer cover cases, such as this
one, involving fraud on the source of information where the
source has no connection with the other participant in a secu-
rities transaction. It seems obvious that the undisclosed
misappropriation of confidential information is not necessar-
ily consummated by a securities transaction. In this case,
for example, upon learning of Grand Met's confidential take-
over plans, O'Hagan could have done any number of things
with the information: He could have sold it to a newspaper
for publication, see *id.*, at 36; he could have given or sold the
information to Pillsbury itself, see *id.*, at 37; or he could even
have kept the information and used it solely for his personal
amusement, perhaps in a fantasy stock trading game.

Any of these activities would have deprived Grand Met of
its right to "exclusive use," *ante,* at 654, of the information

and, if undisclosed, would constitute "embezzlement" of Grand Met's informational property. Under *any* theory of liability, however, these activities would not violate § 10(b) and, according to the Commission's monetary embezzlement analogy, these possibilities are sufficient to preclude a violation under the misappropriation theory even where the informational property *was* used for securities trading. That O'Hagan actually did use the information to purchase securities is thus no more significant here than it is in the case of embezzling money used to purchase securities. In both cases the embezzler *could have* done something else with the property, and hence the Commission's necessary "connection" under the securities laws would not be met.[2] If the relevant test under the "in connection with" language is whether the fraudulent act is *necessarily* tied to a securities transaction, then the misappropriation of confidential information used to trade no more violates § 10(b) than does the misappropriation of funds used to trade. As the Commission concedes that the latter is not covered under its theory, I am at a loss to see how the same theory can coherently be applied to the former.[3]

---

[2] Indeed, even if O'Hagan or someone else thereafter used the information to trade, the misappropriation would have been complete before the trade and there should be no § 10(b) liability. The most obvious real-world example of this scenario would be if O'Hagan had simply tipped someone else to the information. The mere act of passing the information along would have violated O'Hagan's fiduciary duty and, if undisclosed, would be an "embezzlement" of the confidential information, regardless of whether the tippee later traded on the information.

[3] The majority is apparently unimpressed by the example of a misappropriator using embezzled information for personal amusement in a fantasy stock trading game, finding no need for the Commission to "inhibit" such recreational uses. *Ante*, at 657, n. 8. This argument, of course, misses the point of the example. It is not that such a use does or should violate the securities laws yet is not covered by the Commission's theory; rather, the example shows that the misappropriation of information is not "only" or "inherently" tied to securities trading, and hence the misappropriation

The majority makes no attempt to defend the misappropriation theory as set forth by the Commission. Indeed, the majority implicitly concedes the indefensibility of the Commission's theory by acknowledging that alternative uses of misappropriated information exist that do not violate the securities laws and then dismissing the Government's repeated explanations of its misappropriation theory as mere "overstatement." *Ante*, at 657. Having rejected the Government's description of its theory, the majority then engages in the "imaginative" exercise of constructing its own misappropriation theory from whole cloth. Thus, we are told, if we merely "[s]ubstitute 'ordinarily' for 'only'" when describing the degree of connectedness between a misappropriation and a securities transaction, the Government would have a winner. *Ibid.* Presumably, the majority would similarly edit the Government's brief to this Court to argue for only an "ordinary," rather than an "*inherent* connection between the deceptive conduct and the purchase or sale of a security." Brief for United States 21 (emphasis added).

I need not address the coherence, or lack thereof, of the majority's new theory, for it suffers from a far greater, and dispositive, flaw: It is not the theory offered by the Commission. Indeed, as far as we know from the majority's opinion, this new theory has *never* been proposed by the Commission, much less adopted by rule or otherwise. It is a fundamental proposition of law that this Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983). We do not even credit a "*post hoc* rationalizatio[n]" of counsel for the agency, *id.*, at 50, so one is left to wonder how we could possibly rely on a *post hoc* rationaliza-

---

of information, *whatever its ultimate use*, fails the Commission's own test under the "in connection with" requirement of § 10(b) and Rule 10b–5.

tion invented by this Court and never even presented by the Commission for our consideration.

Whether the majority's new theory has merit, we cannot possibly tell on the record before us. There are no findings regarding the "ordinary" use of misappropriated information, much less regarding the "ordinary" use of other forms of embezzled property. The Commission has not opined on the scope of the new requirement that property must "ordinarily" be used for securities trading in order for its misappropriation to be "in connection with" a securities transaction. We simply do not know what would or would not be covered by such a requirement, and hence cannot evaluate whether the requirement embodies a consistent and coherent interpretation of the statute.[4] Moreover, persons subject to

---

[4] Similarly, the majority's assertion that the alternative uses of misappropriated information are not as profitable as use in securities trading, *ante*, at 657, n. 8, is speculative at best. We have no idea what is the best or most profitable use of misappropriated information, either in this case or generally. We likewise have no idea what is the best use of other forms of misappropriated property, and it is at least conceivable that the best use of embezzled money, or securities themselves, is for securities trading. If the use of embezzled money to purchase securities is "sufficiently detached," *ante*, at 657, from a securities transaction, then I see no reason why the non-"inherent" use of information for securities trading is not also "sufficiently detached" under the Government's theory. In any event, I am at a loss to find in the statutory language any hint of a "best-use" requirement for setting the requisite connection between deception and the purchase or sale of securities.

The majority's further claim that it is unremarkable that "a rule suitably applied to the fraudulent uses of certain kinds of information would be stretched beyond reason were it applied to the fraudulent use of money," *ibid.*, is itself remarkable given that the only existing "rule" is Rule 10b–5, which nowhere confines itself to information and, indeed, does not even contain the word. And given that the only "reason" offered by the Government in support of its misappropriation theory applies (or fails to apply) equally to money or to information, the application of the Government's theory in this case is no less "beyond reason" than it would be as applied to financial embezzlement.

this new theory, such as respondent here, surely could not and cannot regulate their behavior to comply with the new theory because, until today, the theory has never existed. In short, the majority's new theory is simply not presented by this case, and cannot form the basis for upholding respondent's convictions.

In upholding respondent's convictions under the new and improved misappropriation theory, the majority also points to various policy considerations underlying the securities laws, such as maintaining fair and honest markets, promoting investor confidence, and protecting the integrity of the securities markets. *Ante*, at 657, 658–659. But the repeated reliance on such broad-sweeping legislative purposes reaches too far and is misleading in the context of the misappropriation theory. It reaches too far in that, regardless of the overarching purpose of the securities laws, it is not illegal to run afoul of the "purpose" of a statute, only its letter. The majority's approach is misleading in this case because it glosses over the fact that the supposed threat to fair and honest markets, investor confidence, and market integrity comes not from the supposed fraud in this case, but from the mere fact that the information used by O'Hagan was nonpublic.

As the majority concedes, because "the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses *to the source* that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation." *Ante*, at 655 (emphasis added). Indeed, were the source expressly to authorize its agents to trade on the confidential information—as a perk or bonus, perhaps—there would likewise be no § 10(b) violation.[5] Yet in either case—disclosed

---

[5] See Tr. of Oral Arg. 9 (Government conceding that, "just as in [*Carpenter* v. *United States*, 484 U. S. 19 (1987)], if [the defendant] had gone to the Wall Street Journal and said, look, you know, you're not paying me very much. I'd like to make a little bit more money by buying stock, the stocks

misuse or authorized use—the hypothesized "inhibiting impact on market participation," *ante*, at 659, would be identical to that from behavior violating the misappropriation theory: "Outsiders" would still be trading based on nonpublic information that the average investor has no hope of obtaining through his own diligence.[6]

The majority's statement that a "misappropriator who trades on the basis of material, nonpublic information, in short, *gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public*," *ante*, at 656 (emphasis added), thus focuses on the wrong point. Even if it is true that trading on nonpublic information hurts the public, it is true whether or not there is any deception of the source of the information.[7] Moreover, as

---

that are going to appear in my Heard on the Street column, and the Wall Street Journal said, that's fine, there would have been no deception of the Wall Street Journal").

[6] That the dishonesty aspect of misappropriation might be eliminated via disclosure or authorization is wholly besides the point. The dishonesty in misappropriation is in the relationship between the fiduciary and the principal, not in any relationship between the misappropriator and the market. No market transaction is made more or less honest by disclosure to a third-party principal, rather than to the market as a whole. As far as the market is concerned, a trade based on confidential information is no more "honest" because some third party may know of it so long as those on the other side of the trade remain in the dark.

[7] The majority's statement, by arguing that market advantage is gained "through" deception, unfortunately seems to embrace an error in logic: Conflating causation and correlation. That the misappropriator may both deceive the source and "simultaneously" hurt the public no more shows a causal "connection" between the two than the fact that the sun both gives some people a tan and "simultaneously" nourishes plants demonstrates that melanin production in humans causes plants to grow. In this case, the only element common to the deception and the harm is that both are the result of the same antecedent cause—namely, using nonpublic information. But such use, even for securities trading, is not illegal, and the consequential deception of the source follows an entirely divergent branch of causation than does the harm to the public. The trader thus "gains his

we have repeatedly held, use of nonpublic information to trade is not itself a violation of § 10(b). *E. g., Chiarella,* 445 U. S., at 232–233. Rather, it is the use of fraud "in connection with" a securities transaction that is forbidden. Where the relevant element of fraud has no impact on the integrity of the subsequent transactions as distinct from the nonfraudulent element of using nonpublic information, one can reasonably question whether the fraud was used in connection with a securities transaction. And one can likewise question whether removing that aspect of fraud, though perhaps laudable, has anything to do with the confidence or integrity of the market.

The absence of a coherent and consistent misappropriation theory and, by necessary implication, a coherent and consistent application of the statutory "use or employ, in connection with" language, is particularly problematic in the context of this case. The Government claims a remarkable breadth to the delegation of authority in § 10(b), arguing that "the very aim of this section was to pick up unforeseen, cunning, deceptive devices that people might cleverly use in the securities markets." Tr. of Oral Arg. 7. As the Court aptly queried, "[t]hat's rather unusual, for a criminal statute to be that open-ended, isn't it?" *Ibid.* Unusual indeed. Putting aside the dubious validity of an open-ended delegation to an independent agency to go forth and create regulations criminalizing "fraud," in this case we do not even have a formal regulation embodying the agency's misappropriation theory. Certainly Rule 10b–5 cannot be said to embody the theory—although it deviates from the statutory language by the addition of the words "any person," it merely repeats, unchanged, § 10(b)'s "in connection with" language. Given that the validity of the misappropriation theory turns on the construc-

---

advantageous market position *through*" the use of nonpublic information, whether or not deception is involved; the deception has no effect on the existence or extent of his advantage.

tion of that language in § 10(b), the regulatory language is singularly uninformative.[8]

Because we have no regulation squarely setting forth some version of the misappropriation theory as the Commission's interpretation of the statutory language, we are left with little more than the Commission's litigating position or the majority's completely novel theory that is not even acknowledged, much less adopted, by the Commission. As we have noted before, such positions are not entitled to deference and, at most, get such weight as their persuasiveness warrants. *Metropolitan Stevedore Co.* v. *Rambo, ante,* at 138, n. 9, 140, n. 10. Yet I find wholly unpersuasive a litigating position by the Commission that, at best, embodies an inconsistent and incoherent interpretation of the relevant statutory language and that does not provide any predictable guidance as to what behavior contravenes the statute. That position is no better than an ad hoc interpretation of statutory language and in my view can provide no basis for liability.

## II

I am also of the view that O'Hagan's conviction for violating Rule 14e–3(a) cannot stand. Section 14(e) of the Exchange Act provides, in relevant part:

"It shall be unlawful for any person . . . to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . . The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means

---

[8] That the Commission may purport to be interpreting its own Rule, rather than the statute, cannot provide it any greater leeway where the Rule merely repeats verbatim the statutory language on which the entire question hinges. Furthermore, as even the majority recognizes, Rule 10b–5 may not reach beyond the scope of § 10(b), *ante,* at 651, and thus the Commission is obligated to explain how its theory fits within its interpretation of § 10(b) even if it purports to be interpreting its own derivative rule.

reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." 15 U. S. C. § 78n(e).

Pursuant to the rulemaking authority conferred by this section, the Commission has promulgated Rule 14e–3(a), which provides, in relevant part:

> "(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the 'offering person'), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the [Securities Exchange] Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:
>
> "(1) The offering person,
>
> "(2) The issuer of the securities sought or to be sought by such tender offer, or
>
> "(3) [Any person acting on behalf of the offering person or such issuer], to purchase or sell [any such securities or various instruments related to such securities], unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise." 17 CFR § 240.14e–3(a) (1996).

As the majority acknowledges, Rule 14e–3(a) prohibits a broad range of behavior regardless of whether such behavior is fraudulent under our precedents. See *ante*, at 669 (Rule applies " 'without regard to whether the trader owes a preexisting fiduciary duty to respect the confidentiality of the information' " (emphasis deleted)) (quoting *United States* v. *Chestman*, 947 F. 2d 551, 557 (CA2 1991) (en banc), cert. denied, 503 U. S. 1004 (1992)).

694

The Commission offers two grounds in defense of Rule 14e–3(a). First, it argues that § 14(e) delegates to the Commission the authority to "define" fraud differently than that concept has been defined by this Court, and that Rule 14e–3(a) is a valid exercise of that "defining" power. Second, it argues that § 14(e) authorizes the Commission to "prescribe means reasonably designed to prevent" fraudulent acts, and that Rule 14e–3(a) is a prophylactic rule that may prohibit nonfraudulent acts as a means of preventing fraudulent acts that are difficult to detect or prove.

The majority declines to reach the Commission's first justification, instead sustaining Rule 14e–3(a) on the ground that

> "under § 14(e), the Commission may prohibit acts not themselves fraudulent under the common law or § 10(b), if the prohibition is 'reasonably designed to prevent . . . acts and practices [that] are fraudulent.'" *Ante*, at 673 (quoting 15 U. S. C. § 78n(e)).

According to the majority, prohibiting trading on nonpublic information is necessary to prevent such supposedly hard-to-prove fraudulent acts and practices as trading on information obtained from the buyer in breach of a fiduciary duty, *ante*, at 675, and possibly "warehousing," whereby the buyer tips allies prior to announcing the tender offer and encourages them to purchase the target company's stock, *ante*, at 672–673, n. 17.[9]

I find neither of the Commission's justifications for Rule 14e–3(a) acceptable in misappropriation cases. With regard to the Commission's claim of authority to redefine the concept of fraud, I agree with the Eighth Circuit that the Commission misreads the relevant provision of § 14(e).

---

[9] Although the majority leaves open the possibility that Rule 14e–3(a) may be justified as a means of preventing "warehousing," it does not rely on that justification to support its conclusion in this case. Suffice it to say that the Commission itself concedes that warehousing does not involve fraud as defined by our cases, see Reply Brief for United States 17, and thus preventing warehousing cannot serve to justify Rule 14e–3(a).

"Simply put, the enabling provision of § 14(e) permits the SEC to identify and regulate those 'acts and practices' which fall within the § 14(e) legal definition of 'fraudulent,' but it does not grant the SEC a license to redefine the term." 92 F. 3d 612, 624 (1996).

This conclusion follows easily from our similar statement in *Schreiber* v. *Burlington Northern, Inc.*, 472 U. S. 1, 11, n. 11 (1985), that § 14(e) gives the "Commission latitude to regulate nondeceptive activities as a 'reasonably designed' means of preventing manipulative acts, without suggesting any change in the meaning of the term 'manipulative' itself."

Insofar as the Rule 14e–3(a) purports to "define" acts and practices that "are fraudulent," it must be measured against our precedents interpreting the scope of fraud. The majority concedes, however, that Rule 14e–3(a) does not prohibit merely trading in connection with fraudulent nondisclosure, but rather it prohibits trading in connection with *any* nondisclosure, regardless of the presence of a pre-existing duty to disclose. *Ante,* at 669. The Rule thus exceeds the scope of the Commission's authority to define such acts and practices as "are fraudulent." [10]

---

[10] Even were § 14(e)'s defining authority subject to the construction given it by the Commission, there are strong constitutional reasons for not so construing it. A law that simply stated "it shall be unlawful to do '*X*', however '*X*' shall be defined by an independent agency," would seem to offer no "intelligible principle" to guide the agency's discretion and would thus raise very serious delegation concerns, even under our current jurisprudence, *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409 (1928). See also *Field* v. *Clark*, 143 U. S. 649, 693–694 (1892) (distinguishing between making the law by determining what it shall be, and executing the law by determining facts on which the law's operation depends). The Commission's interpretation of § 14(e) would convert it into precisely the type of law just described. Thus, even if that were a plausible interpretation, our usual practice is to avoid unnecessary interpretations of statutory language that call the constitutionality of the statute into further serious doubt.

Turning to the Commission's second justification for Rule 14e–3(a), although I can agree with the majority that § 14(e) authorizes the Commission to prohibit nonfraudulent acts as a means reasonably designed to prevent fraudulent ones, I cannot agree that Rule 14e–3(a) satisfies this standard. As an initial matter, the Rule, on its face, does not purport to be an exercise of the Commission's prophylactic power, but rather a redefinition of what "constitute[s] a fraudulent, deceptive, or manipulative act or practice within the meaning of § 14(e)." That Rule 14e–3(a) *could have been* "conceived and defended, alternatively, as definitional or preventive," *ante*, at 674, n. 19, misses the point. We evaluate regulations not based on the myriad of explanations that could have been given by the relevant agency, but on those explanations and justifications that were, in fact, given. See *State Farm*, 463 U. S., at 43, 50. Rule 14e–3(a) may not be "[s]ensibly read" as an exercise of "preventive" authority, *ante*, at 674, n. 19; it can only be *differently* so read, contrary to its own terms.

Having already concluded that the Commission lacks the power to redefine fraud, the regulation cannot be sustained on its own reasoning. This would seem a complete answer to whether the Rule is valid because, while we might give deference to the Commission's regulatory constructions of § 14(e), the reasoning used by the regulation itself is in this instance contrary to law and we need give no deference to the Commission's *post hoc* litigating justifications not reflected in the regulation.

Even on its own merits, the Commission's prophylactic justification fails. In order to be a valid prophylactic regulation, Rule 14e–3(a) must be reasonably designed not merely to prevent *any* fraud, but to prevent persons from engaging in "fraudulent, deceptive, or manipulative acts or practices, *in connection with* any tender offer." 15 U. S. C. § 78n(e) (emphasis added). Insofar as Rule 14e–3(a) is designed to prevent the type of misappropriation at issue in this case, such acts are not legitimate objects of prevention because

the Commission's misappropriation theory does not represent a coherent interpretation of the statutory "in connection with" requirement, as explained in Part I, *supra.* Even assuming that a person misappropriating information from the bidder commits fraud on the bidder, the Commission has provided no coherent or consistent explanation as to why such fraud is "in connection with" a tender offer, and thus the Commission may not seek to prevent indirectly conduct which it could not, under its current theory, prohibit directly.[11]

Finally, even further assuming that the Commission's misappropriation theory is a valid basis for direct liability, I fail to see how Rule 14e–3(a)'s elimination of the requirement of a breach of fiduciary duty is "reasonably designed" to prevent the underlying "fraudulent" acts. The majority's primary argument on this score is that in many cases " 'a breach of duty is likely but difficult to prove.' " *Ante*, at 674 (quoting Reply Brief for United States 16). Although the majority's hypothetical difficulties involved in a tipper-tippee situation might have some merit in the context of "classical" insider trading, there is no reason to suspect similar difficulties in "misappropriation" cases. In such cases, Rule 14e–3(a) requires the Commission to prove that the defendant "knows or has reason to know" that the nonpublic information upon which trading occurred came from the bidder or an agent of the bidder. Once the source of the information has been identified, it should be a simple task to obtain proof of any breach of duty. After all, it is the bidder itself that was defrauded in misappropriation cases, and there is no rea-

---

[11] I note that Rule 14e–3(a) also applies to persons trading upon information obtained from an insider of the target company. Insofar as the Rule seeks to prevent behavior that would be fraudulent under the "classical theory" of insider trading, this aspect of my analysis would not apply. As the majority notes, however, the Government "could not have prosecuted O'Hagan under the classical theory," *ante*, at 653, n. 5, hence this proviso has no application to the present case.

son to suspect that the victim of the fraud would be reluctant to provide evidence against the perpetrator of the fraud.[12] There being no particular difficulties in proving a breach of duty in such circumstances, a rule removing the requirement of such a breach cannot be said to be "reasonably designed" to prevent underlying violations of the misappropriation theory.

What Rule 14e–3(a) was in fact "designed" to do can be seen from the remainder of the majority's discussion of the Rule. Quoting at length from the Commission's explanation of the Rule in the Federal Register, the majority notes the Commission's concern with " 'unfair disparities in market information and market disruption.' " *Ante*, at 674 (quoting 45 Fed. Reg. 60412 (1980)). In the Commission's further explanation of Rule 14e–3(a)'s purpose—continuing the paragraph partially quoted by the majority—an example of the problem to be addressed is the so-called "stampede effect"

---

[12] Even where the information is obtained from an agent of the bidder, and the tippee claims not to have known that the tipper violated a duty, there is still no justification for Rule 14e–3(a). First, in such circumstances the tipper himself would have violated his fiduciary duty and would be liable under the misappropriation theory, assuming that theory were valid. Facing such liability, there is no reason to suspect that the tipper would gratuitously protect the tippee. And if the tipper accurately testifies that the tippee was (falsely) told that the information was passed on without violating the tipper's own duties, one can question whether the tippee has in fact done anything illegal, even under the Commission's misappropriation theory. Given that the fraudulent breach of fiduciary duty would have been complete at the moment of the tip, the subsequent trading on that information by the tippee might well fail even the Commission's own construction of the "in connection with" requirement. See *supra*, at 683–687. Thus, even if the tipper might, in some circumstances, be inclined to protect the tippee, see *ante*, at 675–676, n. 20, it is doubtful that the tippee would have violated the misappropriation theory in any event, and thus preventing such nonviolations cannot justify Rule 14e–3(a). Second, even were this scenario a legitimate concern, it would at most justify eliminating the requirement that the tippee "know" about the breach of duty. It would not explain Rule 14e–3(a)'s elimination of the requirement that there *be* such a breach.

based on leaks and rumors that may result from trading on material, nonpublic information. *Id.*, at 60413. The majority also notes (but does not rely on) the Government's contention that it would not be able to prohibit the supposedly problematic practice of "warehousing"—a bidder intentionally tipping allies to buy stock in advance of a bid announcement—if a breach of fiduciary duty were required. *Ante*, at 672–673, n. 17 (citing Reply Brief for United States 17). Given these policy concerns, the majority notes with seeming approval the Commission's justification of Rule 14e–3(a) "as a means necessary and proper to assure the efficacy of Williams Act protections." *Ante*, at 674.

Although this reasoning no doubt accurately reflects the Commission's purposes in adopting Rule 14e–3(a), it does little to support the validity of that Rule as a means designed to prevent such behavior: None of the above-described acts involve breaches of fiduciary duties, hence a Rule designed to prevent them does not satisfy § 14(e)'s requirement that the Commission's Rules promulgated under that section be "reasonably designed to prevent" acts and practices that "are fraudulent, deceptive, or manipulative." As the majority itself recognizes, there is no "'general duty between all participants in market transactions to forgo actions based on material, nonpublic information,'" and such duty only "'arises from a specific relationship between two parties.'" *Ante*, at 661 (quoting *Chiarella*, 445 U. S., at 233). Unfair disparities in market information, and the potential "stampede effect" of leaks, do not necessarily involve a breach of any duty to anyone, and thus are not proper objects for regulation in the name of "fraud" under § 14(e). Likewise (as the Government concedes, Reply Brief for United States 17), "warehousing" is not fraudulent given that the tippees are using the information with the express knowledge and approval of the source of the information. There simply would be no deception in violation of a duty to disclose under such circumstances. Cf. *ante*, at 654–655 (noting Government's conces-

sion that use of bidder's information with bidder's knowledge is not fraudulent under misappropriation theory).

While enhancing the overall efficacy of the Williams Act may be a reasonable goal, it is not one that may be pursued through § 14(e), which limits its grant of rulemaking authority to the prevention of fraud, deceit, and manipulation. As we have held in the context of § 10(b), "not every instance of financial unfairness constitutes fraudulent activity." *Chiarella, supra,* at 232. Because, in the context of misappropriation cases, Rule 14e–3(a) is not a means "reasonably designed" to prevent persons from engaging in fraud "in connection with" a tender offer, it exceeds the Commission's authority under § 14(e), and respondent's conviction for violation of that Rule cannot be sustained.

## III

With regard to respondent's convictions on the mail fraud counts, my view is that they may be sustained regardless of whether respondent may be convicted of the securities fraud counts. Although the issue is highly fact bound, and not independently worthy of plenary consideration by this Court, we have nonetheless accepted the issue for review and therefore I will endeavor to resolve it.

As I read the indictment, it does not materially differ from the indictment in *Carpenter* v. *United States,* 484 U. S. 19 (1987). There, the Court was unanimous in upholding the mail fraud conviction, *id.,* at 28, despite being evenly divided on the securities fraud counts, *id.,* at 24. I do not think the wording of the indictment in the current case requires a finding of securities fraud in order to find mail fraud. Certainly the jury instructions do not make the mail fraud count dependent on the securities fraud counts. Rather, the counts were simply predicated on the same *factual* basis, and just because those facts are legally insufficient to constitute securities fraud does not make them legally insufficient

to constitute mail fraud.[13]  I therefore concur in the judgment of the Court as it relates to respondent's mail fraud convictions.

---

[13] While the majority may find it strange that the "mail fraud net" is broader reaching than the securities fraud net, *ante*, at 678, n. 25, any such supposed strangeness—and the resulting allocation of prosecutorial responsibility between the Commission and the various United States Attorneys—is no business of this Court, and can be adequately addressed by Congress if it too perceives a problem regarding jurisdictional boundaries among the Nation's prosecutors.  That the majority believes that, upon shifting from securities fraud to mail fraud prosecutions, the "practical consequences for individual defendants might not be large," *ibid.*, both undermines the supposed policy justifications for today's decision and makes more baffling the majority's willingness to go to such great lengths to save the Commission from itself.