# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
*Plaintiff-Appellant,*

v.

J. THOMAS TALBOT,
*Defendant-Appelle.*

No. 06-55561

D.C. No.
CV-04-04556-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
December 4, 2007—Pasadena, California

Filed June 30, 2008

Before: David R. Thompson, Kim McLane Wardlaw, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

Brian G. Cartwright, General Counsel, Andrew N. Vollmer, Deputy General Counsel, Jacob H. Stillman, Solicitor, Randall W. Quinn, Assistant General Counsel, Michael L. Post, Senior Counsel, Washington, D.C., for plaintiff-appellant Securities and Exchange Commission.

Richard Marmaro, Lance A. Etcheverry, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California; Preeta D. Bansal, Timothy G. Nelson, Sarah E. McCallum, Of Counsel, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for defendant-appellee J. Thomas Talbot.

**OPINION**

WARDLAW, Circuit Judge:

J. Thomas Talbot, a member of the board of directors of Fidelity National Financial, Inc., a Delaware corporation, traded on confidential information about the impending acquisition of LendingTree, Inc., which he received in his capacity as a Fidelity director. We must decide whether Talbot can be held liable under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, for misappropriating information from Fidelity, in the absence of a fiduciary duty of confidentiality owed to LendingTree by Fidelity or Talbot when he executed the trades. We hold that Talbot can be held liable, under the circumstances here, but that a genuine issue of material fact exists as to the issue of materiality. We therefore reverse and remand the district court's grant of summary judgment in favor of Talbot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

J. Thomas Talbot is a businessman and attorney who, for the past thirty years, has served as a director on the boards of several companies. In April 2003, Talbot sat on the Board of Directors (the "Board") of Fidelity National Financial, Inc. ("Fidelity"), a publicly traded Delaware corporation and national title insurance company. Fidelity owned approximately a 10 percent interest in LendingTree, Inc. ("LendingTree"), an online lending and realty services exchange, which is publicly traded on the NASDAQ National Market System.

On April 18 or 19, 2003, LendingTree's CEO, Douglas Lebda, informed Brent Bickett, Fidelity's Vice President, that negotiations were proceeding for a third party to acquire

LendingTree. Lebda informed Bickett because, "as a significant shareholder of [LendingTree], we knew that [Fidelity] would need to ultimately consent to a transaction, if it happened." Although Lebda did not state the name of the potential acquirer, Lebda indicated that the "majority of the [LendingTree] Board was in favor of the transaction," that the acquirer "was not a competitor of Fidelit[y's]," and that Bickett "would need to keep this information confidential." Lebda explained that "the net share price was in the $14 to $15 range" but did not recall discussing "whether Fidelity would make a profit as a result of the acquisition." Bickett testified during his deposition that Lebda did not inform him that the information was confidential, but that Bickett "had an understanding that [the] information was confidential information." Bickett then relayed this information to William Foley, Fidelity's CEO.

On April 22, 2003, Fidelity held its quarterly board meeting, which Talbot attended. Toward the end of the four- or five-hour meeting, Foley presented to the Board the information from Bickett for a Board discussion as to whether Fidelity should agree to refrain from selling its LendingTree stock during the pendency of the transaction and also "agree to [vote Fidelity's] shares in favor of the transaction." Foley told the Board the "exciting information" that "Lending Tree was going to be acquired." Foley also informed the Board that "[w]e didn't know who the acquirer was at that time because [LendingTree] would not disclose it to us," but that Fidelity "would make about $50 million on the transaction." According to Terry Christensen, another Board member, Foley informed the Board that Fidelity's stock in LendingTree "would be acquired at a very attractive price," between $16 and $18, which represented a 23-39 percent increase over LendingTree's closing price of $12.97 per share on April 22, 2003. Talbot remembered the meeting differently, declaring that, although he could "not recall the exact words spoken . . . some person or company might be interested in acquiring LendingTree, Inc. . . . and [Fidelity] would benefit if the

transaction occurred." The response from the Board at the meeting was positive. According to Foley, "everyone said . . . it sounds like a great idea. . . . No one disagreed with it."

Although Foley did not tell the Board that the information was confidential, one Board member, Cary Thompson, said "something to the effect that this is inside information, no one trade in the stock. Make sure you don't do anything with the stock." Thompson said this "plenty loud. It was loud enough to hear him." All Board members present at the meeting, except for Talbot, considered the LendingTree information to be confidential.

Various directors testified at depositions to their understanding of how far along the negotiations had proceeded between LendingTree and the unnamed acquirer, as conveyed by Foley: "far along, and it would be announced as a deal shortly thereafter" (Thompson); "advanced discussions" (Bickett); and that "it looked like there was going to be a transaction" (Christensen). Talbot interpreted Foley's words as far less definite, understanding the information about LendingTree to be a "rumor," not a "factual statement." Talbot wrote "*LENDING TREE*" at the top of his copy of the meeting agenda; those were the only notes he took during the meeting.

On April 24, 2003, two days after the meeting, Talbot purchased on margin 5000 shares of LendingTree at approximately $13.50 per share for a total of $67,500. Talbot testified that Foley's comments at the April 22, 2003 regarding LendingTree "triggered [his] conduct on April 23rd to look into [LendingTree] more carefully." A number of factors influenced his decision to purchase the stock: Fidelity had invested in it; it was a real estate company, which he considered to be a good buy; interest rates would likely remain low; the high-tech market was experiencing a resurgence; and, based on the "rumor" at the April 22 meeting, other people were clearly

interested in it, so he should be as well. Talbot "wanted to buy before anything happened."

On April 25, 2003, LendingTree sent Fidelity a written letter agreement restricting the manner in which Fidelity could use any confidential information it received from Lending-Tree in connection with the proposed tender offer. The agreement stated:

> FNF [Fidelity] may disclose Confidential Information to its directors, officers, employees, partners, affiliates, agents, advisors or representatives . . . to the extent necessary to permit such Representatives to assist FNF in evaluating and analyzing a Possible Transaction, *provided, however,* that FNF shall instruct each such Representative to be bound by the terms of this Agreement to the same extent as if they were parties hereto and FNF shall be responsible for any breach of this Agreement by any of its Representatives . . . .

The directors were not advised of the confidentiality agreement.

Talbot continued to monitor LendingTree's stock closely, and, after being satisfied that "the price was moving up . . . [a]nd the volume was solid," on April 30, 2003, he purchased on margin an additional 5000 shares at $14.50 per share for $72,500.

On May 5, 2003, three major events occurred, in the following sequence. First, Fidelity executed an agreement with USA Interactive Corporation (the acquiring company) and LendingTree to vote its shares in favor of the acquisition. Second, LendingTree and USA Interactive issued a press release announcing the acquisition. Third, LendingTree's stock rose roughly 41 percent on the news, immediately after which Talbot sold all of his LendingTree shares for a profit of

$67,881.20. LendingTree stock closed on Monday, May 5 at $20.72, up $6.03 from its previous closing price of $14.69 on Friday, May 2. The Securities and Exchange Commission ("SEC") commenced an investigation into Talbot's trading activity. Talbot resigned from the Board on September 19, 2003.

## B. District Court Proceedings

On June 23, 2004, the SEC brought a civil action against Talbot in the District Court for the Central District of California. The complaint alleged that Talbot had traded on material, nonpublic information in violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

Both parties moved for summary judgment. The district court granted Talbot's motion and denied the SEC's on February 14, 2006. Ruling on the SEC's "misappropriation theory" of liability, *see generally United States v. O'Hagan*, 521 U.S. 642 (1997), the district court held that Talbot could be liable under such a theory only if Talbot or Fidelity owed a fiduciary duty of confidentiality to LendingTree, the "originating source" of the information on which Talbot traded. *SEC v. Talbot*, 430 F. Supp. 2d 1029, 1049, 1064 (C.D. Cal. 2006). Although the district court concluded that Fidelity was the "immediate 'source'" of the information on which Talbot traded, *id.* at 1049, it held that because the SEC did not carry its burden of proving that Talbot, Fidelity, and LendingTree were "linked through a continuous chain of fiduciary relationships," no liability could attach for Talbot's actions. *Id.* at 1049-50. The district court also found a genuine issue of material fact as to whether the information on which Talbot traded was material. *Id.* at 1039-42, 1051 n.65.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 15 U.S.C. §§ 78u(d)-(e) and 78aa, which confer jurisdiction in the dis-

trict courts over violations of federal securities laws. We have jurisdiction over "final decisions" of the district courts pursuant to 28 U.S.C. § 1291.

We review a district court's grant of summary judgment de novo. *Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 954 (9th Cir. 2008). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* However, "[q]uestions of materiality, scienter, and reliance are mixed questions of law and fact, but ones involving assessments peculiarly within the province of the trier of fact. They are therefore reviewed under the 'clearly erroneous' standard." *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

## III.  DISCUSSION

### A.  The Misappropriation Theory

Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to § 10(b), the SEC promulgated Rule 10b-5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[1] Traditionally, § 10(b) and Rule 10b-5 have reached only what is termed "classical" insider trading. "Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *O'Hagan*, 521 U.S. at 651-52. Such trading qualifies as a "deceptive device" under § 10(b) because " 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.' " *Id.* at 652 (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980) (alteration in original)). The relationship of trust and confidence between the trader and the shareholders of the corporation in which he trades "gives rise to a duty to disclose [or to abstain from trad-

ing] because of the 'necessity of preventing a corporate insider from . . . taking unfair advantage of . . . uninformed . . . stockholders.' " *Id.* (quoting *Chiarella*, 445 U.S. at 228-29 (alteration in original)).

Liability under the classical theory was not without limit, however, as it did not reach trading by an outsider who owed no fiduciary relationship to the corporation in whose shares he traded. For example, in *Chiarella v. United States*, the Supreme Court held that an employee of a financial printer who traded in securities of the targets of the printer's clients' takeover bids could not be found guilty of insider trading. The printer, and derivatively, the employee, were not insiders of and had no duty to the targets, the entities in whose stock the employee traded. *Chiarella*, 445 U.S. at 231. The Court made clear that there is no "general duty between all participants in market transactions to forgo actions based on material, non-public information." *Id.* at 233. Rather, a duty to disclose or abstain from trading "arises from a specific relationship between two parties." *Id.*; *see also Dirks v. SEC*, 463 U.S. 646, 654 (1983) ("We were explicit in *Chiarella* in saying that there can be no duty to disclose where the person who has traded on inside information 'was not [the corporation's] agent, . . . was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence.' " (quoting *Chiarella*, 445 U.S. at 232) (alterations in original)).

**[2]** In *Chiarella*, the United States had argued that the employee "breached a duty to the acquiring corporation when he acted upon information that he obtained by virtue of his position as an employee of a printer employed by the corporation," but the majority did not address this question because it was not submitted to the jury. *Chiarella*, 445 U.S. at 235-36. In 1997, the Supreme Court gave its answer, recognizing a "complementary" theory of liability referred to as the "misappropriation" theory. *O'Hagan*, 521 U.S. at 652. Under this theory, "a person commits fraud 'in connection with' a

securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* The misappropriation theory reaches trading by corporate outsiders, not insiders; therefore, as a corporate outsider, the misappropriator owes no duty to the investor with whom he trades, a requirement for liability under the classical theory of insider trading. Rather, "[i]n lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *Id.* "Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id.* "Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation . . . ." *Id.* at 655.

## B. Talbot's Liability Under the Misappropriation Theory

**[3]** Because Talbot traded in LendingTree securities—a corporation in which he was not an insider—liability can attach to his conduct only under the misappropriation theory. For a court to hold Talbot liable under the misappropriation theory, the SEC must demonstrate that Talbot knowingly misappropriated confidential, material, and nonpublic information for securities trading purposes, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information. *See SEC v. Clark*, 915 F.2d 439, 443 (9th Cir. 1990).

Neither party challenges the district court's findings that (1) the SEC failed to carry its burden of showing that Fidelity

owed a fiduciary duty to LendingTree; (2) the information was nonpublic; or (3) Talbot knowingly used the LendingTree information to trade in LendingTree securities. Thus, for the SEC to prevail on appeal, it must demonstrate that (1) Talbot breached a fiduciary duty arising from a relationship of trust and confidence owed to the source of the information on which he traded; and (2) the information on which Talbot traded was material.

### 1. Breach of Duty

The SEC contends that because "Talbot had a duty to . . . Fidelity, to keep information about the LendingTree transaction confidential, and [because] he secretly breached that duty by trading securities for personal profit," he can be held liable under the misappropriation theory.[1] We agree.[2]

In *United States v. O'Hagan*, the leading Supreme Court decision addressing the misappropriation theory, the SEC brought an action against James O'Hagan under, *inter alia*, § 10(b) and Rule 10b-5. *O'Hagan*, 521 U.S. at 648. O'Hagan was a partner in the law firm Dorsey & Whitney, which represented Grand Metropolitan PLC ("Grand Met") in connection with a potential tender offer for the Pillsbury Company's common stock. *Id.* at 647. O'Hagan did not work on the matter, but he used information he received in his partnership capacity at the firm to purchase and sell Pillsbury Company

---

[1] Contrary to Talbot's contention, the SEC did not waive this argument below, as it raised the argument numerous times in its moving papers.

[2] It is unclear from the record before us whether Fidelity and, by extension, Talbot, owed a fiduciary duty arising from a relationship of trust and confidence to LendingTree. The district court determined that the SEC had not carried its burden of proving that such a duty existed. The SEC has not appealed that holding, arguing that Talbot's relationship to Fidelity alone is sufficient to sustain liability. Accordingly, the SEC has waived its contention below that Talbot and Fidelity owed a fiduciary duty arising from a relationship of trust and confidence to LendingTree, and we proceed under the assumption that they did not.

securities, netting him more than $4.3 million. *Id.* at 647-48. The Supreme Court held that "criminal liability under § 10(b) may be predicated on the misappropriation theory." *Id.* at 650. The Court noted that "it [was O'Hagan's] failure to disclose his personal trading to Grand Met and Dorsey, in breach of his duty to do so, that made his conduct 'deceptive' within the meaning of [§] 10(b)." *Id.* at 660 (internal quotation marks omitted and alterations in original); *cf. Clark*, 915 F.2d at 453 ("[A]n employee's knowing misappropriation and use of his employer's material nonpublic information regarding its intention to acquire another firm constitutes a violation of § 10(b) and Rule 10b-5.").

The district court interpreted the misappropriation theory as requiring that "the trader and the originating source of the nonpublic information [be] linked through a continuous chain of fiduciary relationships: The employee [must owe] a duty to his employer to refrain from exploiting the information, and the employer in turn [must owe] the same duty to the corporate client." *Talbot*, 430 F. Supp. 2d at 1049-50. This interpretation is understandable, for many cases addressing the misappropriation theory involve a "continuous chain" of duties. *See, e.g.*, *SEC v. Cherif*, 933 F.2d 403, 406, 410-11 (7th Cir. 1991) (holding that a bank's former employee breached his fiduciary duty to the bank by misappropriating confidential information regarding the bank's clients' prospective financial transactions); *SEC v. Materia*, 745 F.2d 197, 202 (2d Cir. 1984) (holding that the employee of a financial printing company misappropriated information about proposed tender offers from documents submitted by the printing company's clients in breach of a fiduciary duty to his employer); *SEC v. Musella*, 578 F. Supp. 425, 438-39 (S.D.N.Y. 1984) (holding that a law firm's employee breached his duty of confidentiality to the law firm and its clients by misappropriating material nonpublic information about the firm's clients).

**[4]** Although a continuous chain of duties existed in each of the cases relied upon by the district court, a continuous

chain of duties is not a requirement for liability to attach under the misappropriation theory. In *O'Hagan*, the Supreme Court held that O'Hagan had breached two independent duties: (1) his duty to Dorsey & Whitney, his law firm; and (2) his duty to Grand Met, the corporation that his law firm represented. That a continuous chain of duties flowed from O'Hagan to Dorsey & Whitney to Grand Met is of no moment, as the Court never intimated that such a chain was necessary. Indeed, the Court declared that "[w]here . . . a person trading on the basis of material, nonpublic information owes a duty of loyalty and confidentiality to two entities or persons—for example, a law firm and its client—but makes disclosure to only one, the trader may still be liable under the misappropriation theory." *O'Hagan*, 521 U.S. at 655 n.7. Thus, O'Hagan's relationship with Dorsey and Whitney was sufficient to support liability under the misappropriation theory. Further, the Court explained that liability attached to O'Hagan's conduct because he owed a fiduciary duty to disclose the information "to the source of the information, here, Dorsey & Whitney and Grand Met." *Id.* at 655 n.6. The district court misinterpreted the misappropriation theory as requiring that the duty of confidentiality be owed to the "originating source" of the information. *O'Hagan* stated quite clearly that the duty must be owed only to the "source"; we decline to read an "originating source" requirement into *O'Hagan*.

**[5]** This interpretation of *O'Hagan* is confirmed by *United States v. Carpenter*. In *Carpenter*, employees of the *Wall Street Journal* participated in a fraudulent scheme in which their tippees traded based on information to be included in the paper's influential "Heard on the Street" column. 791 F.2d 1024, 1026 (2d Cir. 1986), *aff'd by an evenly divided Court*, 484 U.S. 19, 24 (1987). The *Wall Street Journal* did not trade in the securities and had not received the information from clients that intended to do so. The Second Circuit upheld their convictions under § 10(b) and Rule 10b-5. *Id.* at 1026. The Second Circuit rejected the argument that "it was not enough

that [the employee] breached a duty of confidentiality to his employer, the *Wall Street Journal*, in misappropriating and trading on material nonpublic information[, and that] he would have to have breached a duty to the corporations or shareholders thereof whose stock [his tippees] purchased or sold on the basis of that information." *Id.* at 1029. Noting that such an interpretation of the misappropriation theory would be too narrow, the Second Circuit reasoned, "the misappropriation theory more broadly proscribes the conversion by 'insiders' *or others* of material non-public information in connection with the purchase or sale of securities. . . . It is precisely such conversion that serves as the predicate for the convictions herein." *Id.*

**[6]** The Second Circuit thus found liability in *Carpenter* where the employee breached his duty to the *Wall Street Journal*, his employer and the immediate source of the information on which his tippees traded. Similarly, Talbot traded on information he received from Fidelity, the immediate source and rightful owner of the information on which he traded. The *Carpenter* decision squarely supports our conclusion that a continuous chain of duties is not required for liability under the misappropriation theory. Our reliance on the *Carpenter* decision is complicated only by the Supreme Court's affirmance without comment as to the misappropriation theory. The Court instead focused its discussion on the mail and wire fraud violations at issue there. *Carpenter v. United States*, 484 U.S. at 24-28 ("The Court is evenly divided with respect to the convictions under the securities laws and for that reason affirms the judgment below on those counts."); *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 234 n.7 (1987) ("[A]n affirmance by an equally divided Court is not entitled to precedential weight."). However, Justice Ginsburg breathed new life into *Carpenter*'s application of the misappropriation theory in *O'Hagan*, where she explained that *Carpenter* is "a particularly apt source of guidance" in securities cases. *O'Hagan*, 521 U.S. at 654 (internal quotation

marks omitted). Noting that *Carpenter* involved "fraud of the same species," Justice Ginsburg analogized to property rights:

> A company's confidential information, we recognized in *Carpenter*, qualifies as property to which the company has a right of exclusive use. The undisclosed misappropriation of such information, in violation of a fiduciary duty, the Court said in *Carpenter*, constitutes fraud akin to embezzlement—the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.

*Id.* (citations and quotation marks omitted).

[7] The Court's adoption of *Carpenter*'s reasoning in support of its holding on the misappropriation theory leads to the conclusion that Talbot's conduct is encompassed within the misappropriation theory of securities liability. As in *Carpenter* and *O'Hagan*, Talbot, as a member of Fidelity's Board, owed a duty arising from a relationship of trust and confidence to Fidelity, the source of the information on which he traded. The information on which Talbot traded was confidential, as it was property "entrusted" to him by Fidelity in his capacity as a Fidelity director. This is textbook misappropriation.

[8] Talbot contends that "[n]o reasonable factfinder could conclude that Mr. Talbot was obligated to keep the Lending-Tree information confidential." We disagree. Although the Court did not define the precise contours of the fiduciary duty captured by the misappropriation theory, it is clear that Talbot falls within *O'Hagan*'s ambit. In *O'Hagan*, the Court found that a partner in a law firm is in a relationship of trust and confidence with his firm. It follows that Talbot, as a member of Fidelity's Board of Directors, was also in a relationship of trust and confidence with Fidelity. This conclusion is supported by nearly seven decades of Delaware law, and common sense: "Corporate officers and directors are not permitted

to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Ch. 1939); *see also Teren v. Howard*, 322 F.2d 949, 953 (9th Cir. 1963) (quoting the above-quoted language approvingly); *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 907 (Del. Ch. 1999) ("[D]irectors of corporations organized under Delaware law owe a fiduciary duty to the corporations upon whose boards they serve and to the stockholders of those corporations." (internal quotations marks and citation omitted)); Restatement (Second) of Agency § 395 ("Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge."); William E. Knepper and Dan A. Bailey, 1 LIABILITY OF CORPORATE OFFICERS AND DIRECTORS § 4-23 (7th ed. 2007) ("A corporation is entitled to keep confidential information obtained and assembled in the course of conducting its business. Such information is a type of property to which the corporation has an exclusive right. A director has a duty to use reasonable diligence to protect and safeguard his corporation's property, and he may not use it in his own personal interests, even if he or she causes no injury to the corporation.") (footnotes omitted).

**[9]** Talbot further contends that the information on which he traded was not confidential. He relies on his belief that the LendingTree information was a "rumor," and the fact that Foley did not indicate the information was confidential. We find these arguments to be unpersuasive. As a matter of law, the very nature of the information on which Talbot traded was confidential. *See, e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1046 (Del. Ch. 2004) (holding that "not publicly avail-

able . . . and sensitive" advice the Chairman of the Board and Chief Executive Officer received in his official capacity regarding his company's value in connection with a potential acquisition of one of the company's key assets was "confidential"), *aff'd*, 872 A.2d 559 (Del. 2005); *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7-8 (Del. Ch. 1949) (holding that an employee's nonpublic knowledge that his company intended to acquire its own capital stock was confidential information). As the SEC points out, "the information about the possible LendingTree acquisition went to the very heart of Talbot's duties to Fidelity." Talbot learned of the LendingTree information from Foley, the CEO of Fidelity, at a meeting of the Board of Directors. Foley announced it to the Board to get a reading on whether the Board would vote Fidelity's shares in favor of the transaction. Because Fidelity had a large stake in LendingTree's stock, this decision would have a big impact on Fidelity's financials, a point that Foley made explicit by informing the Board that Fidelity could potentially make $50 million if the deal went through. This was not a passing reference to a company in which Fidelity had no interest; rather, the weight of the evidence counsels that Foley's comments to the Board, and the Board's subsequent discussion of the transaction, would make clear to any Board member—especially an individual who has sat on boards of directors for over three decades—that the information was confidential and not to be used for personal gain. Indeed, every other director present at the meeting considered the information to be confidential.

**[10]** Talbot's use of Fidelity's confidential information, in breach of his duty to disclose that he intended to use that information before doing so, was in direct contravention of the purposes of the Exchange Act. As the Court recognized in *O'Hagan*,

> an animating purpose of the Exchange Act . . . [is] to insure honest securities markets and thereby promote investor confidence. Although informational disparity is inevitable in the securities markets,

investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law. An investor's informational disadvantage vis-á-vis a misappropriator with material, nonpublic information stems from contrivance, not luck; it is a disadvantage that cannot be overcome with research or skill.

*O'Hagan*, 521 U.S. at 658-59 (citing Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv. L.Rev. 322, 356 (1979) ("If the market is thought to be systematically populated with . . . transactors [trading on the basis of misappropriated information] some investors will refrain from dealing altogether, and others will incur costs to avoid dealing with such transactors or corruptly to overcome their unerodable informational advantages.")).

Barbara Aldave, Professor of Business Law at the University of Oregon School of Law, whose work was relied upon extensively by the Court in *O'Hagan* and our court in *SEC v. Clark*, provides key insights into the misappropriation theory:

Properly understood, the misappropriation theory only bars trading on the basis of information that the wrongdoer converted to his own use in violation of some fiduciary, contractual, or similar obligation to the owner or rightful possessor of the information.

The misappropriation theory, so understood, comports well with our intuition about what is wrong with trading on nonpublic information. Most of us would not perceive such trading to be unfair merely because one trading party knows more than another. . . . On the other hand, no one likes to play a game with an opponent who has loaded the dice. We think that those who have special access to information,

> because of employment or other relationships, should be barred from using that information to gain an advantage over the rest of us.

Barbara Bader Aldave, *Misappropriation: A General Theory of Liability for Trading on Nonpublic Information*, 13 HOFSTRA L.REV. 101, 12-23 (1984).

The legislative intent and academic commentary relied on by the Court in *O'Hagan* support our conclusion that Talbot's conduct is encompassed within the misappropriation theory. Talbot traded on the LendingTree information in violation of his fiduciary duty to Fidelity to maintain that information in trust and confidence. Talbot contends that, even so, the SEC cannot prevail because it cannot demonstrate that Fidelity was harmed by his conduct. We cannot determine from the record before us whether Talbot's trading injured Fidelity, but it most certainly injured the trading public. The Court in *O'Hagan* stated that "[a] misappropriator who trades on the basis of material, nonpublic information, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public." *O'Hagan*, 521 U.S. at 656 (citing Aldave, 13 HOFSTRA L.REV. at 120-21 ("[O]ne who misappropriates confidential information and uses it in his securities trading deceives the rightful owner or possessor of the information, but causes economic harm to other investors.")). The failure to hold a person in Talbot's trusted position who traded on information acquired by him in that capacity would diminish the public perception of the markets as "honest," as investors would understand that board members—those who have superior access to information about the businesses in which their companies invest—are free to profit off the informational advantages they possess by virtue of their rank.

[11] As Professor Aldave astutely recognizes, investors do not expect the playing field to be level, but they do expect that

those who "have special access to information, because of employment or other relationships, should be barred from using that information to gain an advantage over the rest of us." Aldave, 13 HOFSTRA L.REV. at 123. Talbot misappropriated information from Fidelity, a source to which he owed a fiduciary duty arising from a relationship of trust and confidence by virtue of his position on its Board. Fidelity was the rightful owner of the information, information that was both nonpublic and confidential. This conduct, assuming the information on which Talbot traded was material, falls squarely within the range of conduct the Court contemplated in *O'Hagan*. Accordingly, we hold that, as a matter of law, Talbot "misappropriate[d] confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 652.

### 2. Materiality

The SEC also contends that the LendingTree information on which Talbot traded was material as a matter of law. The district court found that a genuine issue of material fact exists regarding materiality. *Talbot*, 430 F. Supp. 2d at 1042. We agree with the district court.

An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to buy or sell securities. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *Id.* (citation omitted). "Questions of materiality . . . involv[e] assessments peculiarly within the province of the trier of fact." *Arrington*, 651 F.2d at 619 (citing *TSC Indus.*, 426 U.S. at 450).

Courts look to a variety of factors to determine whether information is "material" under § 10(b) and Rule 10b-5. In

assessing "the probability that the event will occur, a fact-finder will need to look to indicia of interest in the transaction at the highest corporate levels," such as "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries . . . ." *Basic*, 485 U.S. at 239. In assessing "the magnitude of the transaction to the issuer of the securities allegedly manipulated, a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value." *Id.* Other factors that courts have considered are (1) an increase in the stock price after public announcement of the merger, *see SEC v. Sekhri*, No. 98 Civ. 2320, 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002); (2) whether the information comes from an insider or some other source, *see SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997); and (3) whether information concerning a potential acquisition is "[un]accompanied by specific quantification or otherwise implied certainty." *See Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115 SAS, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000).

The district court did not clearly err in determining that a genuine issue of material fact exists as to the materiality of the information on which Talbot traded. On the one hand, much of the deposition testimony would support a finding of materiality. Foley informed the Board that Fidelity stood to make a $50 million profit on the acquisition. Thompson and Bickett testified that, based on Foley's representations to the Board, they perceived the acquisition to be in the very advanced stages. Talbot purchased LendingTree stock just two days after hearing the information, and again six days later. The stock rose roughly 41 percent upon announcement of the acquisition, immediately after which Talbot sold all of his LendingTree stock. And, perhaps most tellingly, Talbot testified that he purchased the stock on margin because he "wanted to buy before anything happened."

On the other hand, there is also evidence to support a finding that the information was immaterial. Most notably, Talbot

remembers what was said at the meeting differently than some of the other directors. He recalled Foley saying, only generally, that "some person or company might be interested in acquiring LendingTree, Inc . . . . and that [Fidelity] would benefit if the transaction occurred." In contrast with those who believed that the transaction was in the advanced stages, Talbot understood the transaction to be just a "rumor," not a "factual statement." Moreover, he asserted that no one discussed "when [the acquisition] would occur." This account is generally confirmed by Christensen, who testified that "Mr. Foley was indicating that it looked like [Fidelity's] stock would be sold. I mean, you know, one never knows for sure, but that's what it looked like." Both Talbot's and Christensen's deposition testimony refute the countervailing evidence that Foley communicated a detailed and definite description of the worth of the potential acquisition. Therefore, we cannot say that the district court clearly erred in determining that the information on which Talbot traded was not material as a matter of law, given the genuine issues of material fact, particularly as to what information was actually conveyed to the Fidelity Board.

## IV.   CONCLUSION

[12] For the foregoing reasons, we **REVERSE** the district court and hold that Talbot can be held liable under the misappropriation theory because he traded on confidential information received in his capacity as a member of Fidelity's Board, but that a genuine issue of material fact as to the materiality of the information precludes judgment as a matter of law.

**REVERSED and REMANDED.**